DIETZ et al. v. HORTON MFG. CO.

(Circuit Court of Appeals. Sixth Circuit. May 22, 1909.)

No. 1,840.

1. TRADE-MARKS AND TRADE-NAMES (§ 21*)—SUBJECTS OF OWNERSHIP—PRIORITY OF USE.

Neither complainant nor defendant *held* entitled to the exclusive use of the word "Globe" as a trade-mark for washing machines; it appearing that it had been in use by another manufacturer and his successors in business, whose machines were sold throughout the country, for some years before its adoption by either, and that such use continued for some years afterward.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 21.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 33*)—TITLE—ASSIGNABILITY.

The right to a trade-mark cannot be assigned, except as an incident to the sale of the business and good will in connection with which it has been used, or as an incident to the sale of the premises where the article has been made and has acquired a special reputation in connection with such place.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 37; Dec. Dig. § 33.*

Contracts relating to use of trade-names, see note to Chattanooga Medicine Co. v. Thedford, 14 C. C. A. 104.]

3. TRADE-MARKS AND TRADE-NAMES (§ 32*)—ABANDONMENT—UNFAIR COMPETITION.

Where the owner of a trade-mark has permitted other manufacturers to use it for a number of years without objection, it becomes so far common property that the only restriction which can be imposed on its use is that each user shall so identify his goods as to indicate their origin, and prevent confusion and deception and unfair competition.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Dec. Dig. § 32.*]

4. APPEAL AND ERROR (§ 1178*) — DISPOSITION OF CAUSE — AMENDMENT OF PLEADINGS.

The Circuit Court of Appeals may on its own motion authorize a party to file an amended pleading in the court below to cover relief to which the evidence in the record shows him entitled.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4606; Dec. Dig. § 1178.*]

Appeal from the District Court of the United States for the Southern District of Ohio.

James N. Ramsey, for appellants.

W. P. Denny, for appellee.

Before LURTON, SEVERENS, and WARRINGTON, Circuit Judges.

WARRINGTON, Circuit Judge. This was a suit in equity of the Horton Manufacturing Company, appellee, brought in the Circuit Court of the United States, Southern District of Ohio, against Conrad Dietz, who died later, and revivor was had in the name of his administrators, appellants. Jurisdiction was obtained through diversity of citizenship. The bill was based on alleged infringement of a

trade-mark claimed by appellee and also on alleged unfair competition. Upon hearing in the court below on the bill, answer, and proofs, a decree was rendered finding in favor of appellee, and that Conrad Dietz had been guilty of unfair competition. An injunction was granted against appellants, enjoining further use of the trade-mark, ordering that all labels, etc., be delivered to appellee to be destroyed, and referring the cause to a master to take an account, specifying the objects. Appeal was allowed and perfected.

The first question arising upon the record, as we view it is whether either of the original parties to the suit was entitled to the exclusive use of the word "Globe" as a trade-mark. The pleadings show that each party claimed as against the other the exclusive right to the mark. Appellee based its claim on adoption and use by one Heberger, a washing machine manufacturer of Cincinnati, Ohio, who, as averred in the bill, adopted the mark on the 1st day of June, 1897, and duly transferred it to appellee in 1901. Dietz based his claim on two grounds. One was that he had continuously used the mark since 1893. The other ground was an alleged purchase of the mark by him in May, 1903, of one James H. Taylor, by written transfer, a copy of which is attached to the answer as an exhibit. Thus an issue of priority of adoption and use was made between the parties. The court below found that the weight of the evidence established priority in complainant below.

As regards the uses made by the parties themselves, we should not interfere with this finding. But upon the claim made by Dietz that he had acquired a right to the mark through Taylor it was developed that Taylor had adopted and used the word "Globe" as a trade-mark in the manufacture and sale of washing machines as early as 1885, and that the mark was continuously used thereafter either by himself or with his sanction until the early part of 1902. Taylor, who seems to have been engaged in and otherwise connected with the manufacture of washing machines, was called by Dietz as a witness, and testified thus:

"Q. 13. Please state, if you know, who originated and first adopted the word 'Globe,' and the representation of a globe as a trade-mark for washing machines. A. I did. Q. 14. About when? A. About 1885. Q. 15. Please state how long you continued to be the owner of the trade-mark 'Globe,' which you originated and adopted for washing machines. A. Continuously thereafter until I sold or made an assignment to Conrad Dietz. Q. 16. Please state how you used said trade-mark upon washing machines. A. I first used it as a stencil on the washing machine, with a globe and the word 'Globe' through the center of the globe; afterwards had labels printed to represent a globe, with the word 'Globe' through the center of said globe. * * * Q. 60. Please state, if you remember, where you were located in 1885, and under what name you were operating in the washing machine business at the time you designed and adopted the trade-mark 'Globe' for washing machines, as you have testified. A. Was located on Erie street, west side, between Hamilton and Tecumseh streets [Toledo]. First as J. H. Taylor; afterwards American Churn Company."

Another witness, a salesman of the Bostwick-Braun Company, one Joseph L. Tillman, of Toledo, was called by Dietz and testified in December, 1904, as follows:

"Q. 18. Please state, if you know, whether your company ever sold any of the machines called the 'Globe Washer' as illustrated on said page (refer-

ring t' exhibit), and, if so, about when they commenced to sell washing machines so marked, and how long they have continued to do so. A. I can remember of them selling the Globe washing machines 14 years ago. I bought one myself at that time from Bostwick-Braun Company. I remember of them selling machines up to the time they sold out."

As late as April, 1903, Dietz sought erroneously to have public use proceedings instituted in the Patent Office for the purpose of showing that the mark belonged to the public. In re Dietz, 104 O. G. 852. In an affidavit filed in that proceeding, Dietz stated that he "received in the regular course of business" in each of the years 1893 to 1899, inclusive, a publication issued by the Farm Implement News Company of Chicago, called the "Buyers' Guide," and that in each of these publications, on pages stated, it appeared that under the title "Washing Machines" was the following: "Union Manufacturing Company, Toledo, Ohio, American, Western Globe."

Appellee sought to meet such prior use of the mark in several ways. One was that stenciling or otherwise placing upon the side of the machine the figure of a globe, with the word "Globe" printed across it, was not sufficient to establish a trade-mark. For instance, there appears plainly on the side of the machine, in at least two exhibits showing cuts of the "Western Washer," the figure of a globe with the word "Globe" printed across it; the globe being placed under the word "Western" and above the word "Washer." The claim is that the distinguishing mark is comprised in the words "Western Washer," rather than in the figure containing the word "Globe." We do not, however, discover any denial that the mark in dispute was used in the way mentioned.

If the affidavit of Dietz before alluded to can be relied on, the objection just noticed is met by the advertisements in the "Buyers' Guide," for there the words used to describe the washing machines were "American, Western Globe." A sample of the "Buyers' Guide," in the form of a printed pamphlet for the year 1893, is found in the record and corroborates Dietz as to that year.

Tillman testified as to the use of the word "Globe" thus:

"Q. 26. Please state, if you know, how said washing machines were known to the trade. A. They were known as the 'Globe Washer' in my time, when selling the trade; manufactured by the Union Manufacturing Company."

Another way in which appellee endeavored to meet the claim in respect to Taylor's adoption and use of the mark was that Taylor had transferred his business, including the mark, to a certain company, and that the mark had passed then by due transfers, through certain transferees, to the Union Manufacturing Company mentioned in the "Buyers' Guide," and that the assets of that company were sold in March, 1902, to persons other than Taylor, and the mark abandoned. Taylor, however, claimed in his testimony that he had never parted with his right to the trade-mark. But the important inquiry is whether all this does not show that neither Dietz nor Heberger had a right to adopt the word "Globe" as a characteristic exclusively to distinguish his goods.

In Columbia Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, 37 L. Ed. 1144, the company was engaged in the manufacture of

flour and it brought the suit to restrain defendants from using the word "Columbia" in a brand placed on packages of flour sold by them. After citing a number of decisions to show the general principles of law applicable to trade-marks and the conditions under which a person may establish an exclusive right to the use of a name or symbol, Mr. Justice Jackson said, among other things (page 463 of 150 U. S., page 152 of 14 Sup. Ct. [37 L. Ed. 1144]):

"(3) That the exclusive right to the use of the mark or device claimed as a trade-mark is founded on priority of appropriation; that is to say, the claimant of the trade-mark must have been the first to use or employ the same on like articles of production."

The learned justice thereupon referred to the proof showing that the word "Columbia," before its adoption by the complainant, had been used by a number of other companies—two in Dakota, two in Rhode Island, and one in Indiana. He then said (page 464 of 150 U. S., page 152 of 14 Sup. Ct. [37 L. Ed. 1144]):

"The word 'Columbia,' having been thus previously appropriated and used upon barrels and sacks of flour, was not subject to exclusive appropriation thereafter by the complainant, so as to make it a valid trade-mark such as the law will recognize and protect."

It was also held in the case that the word "Columbia" was not the subject of exclusive appropriation under the rule that words in common use designating locality or section of the country cannot be appropriated by any one as his exclusive trade-mark; but this, we think, does not affect the holding touching prior appropriation.

In O'Rourke v. Central City Soap Co. (C. C.) 26 Fed. 576, a bill in equity was filed to prevent infringement of a trade-mark claimed by plaintiff in the use of the words "anti-washboard," as applied to the manufacture of soap. The facts are involved, but are sufficiently stated in the following portions of the opinion. The case was tried in the Circuit Court, Eastern District of Michigan, before Judge Brown (afterwards Mr. Justice Brown), who said (page 578):

"In the case under consideration, however, the question is presented whether a person may appropriate a trade-mark belonging to another, and subsequently acquire a good title thereto by the abandonment thereof by the first proprietor. The testimony shows, and it is not disputed, that when Winger began manufacturing soap at Sturgis, under the name of 'Winger's Anti-Washboard Soap,' the firm of Clark & Benefiel was manufacturing soap at Mattoon, Ill.; under the same name, and continued so to do for nearly a year after Winger commenced business. During this time he was an admitted trespasser upon their rights. The fact that he supposed the Ohio firm had gone out of business is no defense, if in fact they had an exclusive right to the trade-mark. Millington v. Fox, 3 Mylne & C. 338; Welch v. Knott, 4 Kay & J. 747; Leather Cloth Co. Case, Cox, Trade-Mark Cas., 223. There is no evidence in this case that his competition interfered with the business of Clark & Benefiel, or Stephens, their successor, or that he was the cause of the subsequent abandonment of the business by them; but if it be once conceded that a person may acquire a good title to a trade-mark by appropriation, without the consent of the lawful owner, it would enable a manufacturer, by the use of large capital or superior energy, to drive competitors out of business, by seizing their trade-marks and using them for that very purpose, provided the lawful owner is unable or unwilling to assert his rights by resort to the courts. We think that no court would hesitate to pronounce against a title so obtained. We find it difficult to distinguish such a case, in principle, from the one under consideration, as it might be impossible to prove

that the lawful owner was compelled to discontinue by reason of such competition."

In Bulte v. Igleheart Bros., 137 Fed. 492, 70 C. C. A. 76, the bill was to restrain alleged infringement of a trade-mark for flour, and also to restrain unfair competition in trade. The mark consisted of the words "White Swan" and two circles, within the smaller of which was a pictorial representation of a lake bearing a white swan. It appeared from the findings of the master that the name "White Swan," but without the picture of a swan, was used as a trade-mark for flour in Western New York and in the country around St. Catherines, in Canada, as early as the year 1867, and continuously up to 1872 or 1873, and, further, that a certain firm in 1874 sold flour with the brand "White Swan" and a picture of a swan floating on water. This firm (of Chicago) appeared to have used the swan brand on its packages of flour, though not as its leading brand, from 1874 to 1901, excepting that the picture of the swan was discontinued in 1878. Jenkins, Circuit Judge, said (page 501 of 137 Fed., page 85 of 70 C. C. A.):

"It clearly and certainly appears that prior to the appropriation of the trade-mark containing the words 'White Swan' and the picture of a swan floating upon water by the complainants in 1880, and for at least 15 years prior thereto, the words 'White Swan' had been quite generally used, and the picture of a swan floating upon water had been adopted and used by at least two firms, Eckhart & Swan and Land and his successors. So that there can be no justification for the pretension that the complainants originated this brand. They undoubtedly changed the arrangements of the marks and the picture, but that gave them no right to the exclusive use of the picture or the marks or the name as a trade-mark."

It is sought by counsel for appellee to avoid the rule thus shown, by certain evidence tending to prove that the use of the mark, as made by the Union Manufacturing Company, at Toledo, was not known to Heberger, at Cincinnati, and that Heberger's use was not known to that company. Such uses, it is urged, could not cause confusion or interference with the good will or trade of either. Then, in support of the use by Heberger, reliance is placed on Tetlow v. Tappan (C. C.) 85 Fed. 774.

But the difference between the facts of that case and those of the present case touching prior appropriation is so marked as necessarily to distinguish the two cases, without regard to any views of the law as expressed in the Tetlow Case. Every case of alleged prior appropriation must involve an inquiry into the purpose and duration of use. If the adoption has been but tentative or experimental, or the use but slight and intermittent, it can scarcely be said that the symbol chosen has ever become so far identified with any article of trade as really to point out its origin or ownership, in the sense that a trade-mark is established. Illustrations of this may be found in Levy v. Waitt, 61 Fed. 1008, 10 C. C. A. 227, 25 L. R. A. 190; Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co., 113 Fed. 468, 51 C. C. A. 302; Heublein et al. v. Adams (C. C.) 125 Fed. 782; Brower v. Boulton et al. (C. C.) 53 Fed. 389.

The prior adoption and use of the word "Globe" is shown in the present case to have been made and commenced as early as 1885.

This was 8 years before Dietz claimed to have adopted the word and 12 years before Heberger claims to have adopted it. The word was applied to washing machines by stenciling and otherwise, and was employed also in the names given them. The business of manufacturing and selling the machines, and applying the mark to them, appears to have been continued under one ownership or another until 1902, a period of .17 years. The machines bearing this mark were extensively advertised by the wholesale house of Bostwick-Braun Company, of Toledo; some 9,000 catalogues being distributed by that company alone in the three years from 1894 to 1896. · The salesmen used the catalogues in effecting sales of the machines.

Compton, Ault & Co., of Cincinnati, appear to have handled the machines from 1890 until the business in them ceased. They prepared and circulated several thousand catalogues to assist in the sale of various articles, including these washing machines, supplying their traveling men with the catalogues for that purpose. The machines seem also to have been sold by three jobbing houses of Detroit. Taylor testified that the machines were sold "all over the United States and to some extent in Canada," naming such cities as San Francisco, Seattle, Tacoma, Toronto, Spokane, Chicago, Monroe, Mich., Wheeling, Pittsburg, Columbus, New York, Allegheny, and Ft. Wayne. Dietz, who was operating in the vicinity of Cincinnati, made affidavit, as before pointed out, that he had received the "Buyers' Guide" in every year from 1893 to 1899, inclusive, in which the machine was advertised as "American, Western Globe."

In view of a traffic as widespread as this, emanating from the same state as that in which Heberger and Dietz were operating, and extending to the vicinity, if not the city, where both maintained their factories, it was manifestly impossible that any single mark could of itself point out the origin and ownership of the washing machines produced respectively by the three different manufacturers. Furthermore, it is hardly conceivable that either Heberger or Dietz was ignorant of the prior adoption and use of the mark in question, when they adopted and began to use it. But it is enough to say that they were clearly chargeable with notice of the use.

Our conclusion is that when these men attempted to adopt the word "Globe" as a trade-mark, assuming for the purposes of this conclusion that they both did so, the word had been appropriated by Taylor and either his associates or successors in title.

The claim that Dietz acquired this trade-mark through his transaction with Taylor in 1903, must fail. The theory of the claim, as we understand it, is that Taylor never parted with his title until he made the sale to Dietz. Taylor was not making or selling washing machines at the time of the alleged sale. He had not been doing so on his own account for years. It, therefore, was not possible for Taylor to sell the mark as an incident to any business and good will involving washing machines bearing the mark, or as an incident to any place where such machines were made, at the time of the transfer to Dietz. The most that Taylor could do, as stated in the instrument of assignment, was to transfer his "right, title, and interest in and to said trademark, consisting of the representation of a 'Globe,' including all sten-

cils, stationery, electrotypes, labels, and castings intended for use on the washing machines bearing this trade-mark." True, he in terms included also a "list of Globe washing machine customers, and the good will of said business, together with all claims and damages, both at law and in equity, for profits and damages already accrued or to accrue on account of infringement to said trade-mark, and also all rights of recovery for said infringement."

Analysis of this cannot fail to show that the transfer in effect included only the naked trade-mark. The stencils, etc., afforded only means of applying the trade-mark to machines, when machines should be constructed. The list of customers could have been no more than names, because, in the absence of a business, he could not have customers. So of the "good will of said business."

Decisions cited in support of the claim that Taylor's title to the mark remained in him do not seem to sanction a transaction of this kind. We need notice but one. Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769, involved a sale of a trade-mark as an incident to the sale of the premises where the goods were produced with which the trade-mark was associated. Mr. Justice Field said (page 620 of 100 U. S. [25 L. Ed. 769]):

"As to the right of Pike to dispose of his trade-mark in connection with the establishment where the liquor was manufactured, we do not think there can be any reasonable doubt. It is true, the primary object of a trade-mark is to indicate by its meaning or association the origin of the article to which it is affixed. As distinct property, separate from the article created by the original producer or manufacturer, it may not be the subject of sale. But when the trade-mark is affixed to articles manufactured at a particular establishment, and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred either by contract or operation of law to others, the right to the use of the trade-mark may be lawfully transferred with it."

In Bulte v. Igleheart Bros., cited above, Jenkins, Circuit Judge, speaking for the Court of Appeals, and in entire accord with Kidd v. Johnson, said (page 498 of 137 Fed., page 82 of 70 C. C. A.):

"A trade-mark is analogous to the good will of a business. Whoever heard of a good will being sold to one while the original owner continues the business as before? The good will is inseparable from the business itself. So, likewise, is a trade-mark or trade-name that gives assurance to a purchaser that the article upon which is stamped the trade-mark or trade-name is the genuine production of the manufacturer to whom the trade-name or trade-mark points by association as the maker of the article. Therefore it is that it is a necessary qualification to the assignability of a trade-mark that there goes with it the transfer of the business and good will of the owner of the symbol."

See, also, Brown Chem. Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247; Atlantic Milling Co. v. Robinson (C. C.) 20 Fed. 217; Morgan v. Rogers (C. C.) 19 Fed. 596.

The facts suggest still another view, which we regard as also fatal to the claims of exclusive right in any of the parties to the cause. It is the general and contemporaneous use made of the mark by different manufacturers of washing machines. We have seen that Taylor and his associates or successors were engaged in the use of the mark for nearly, if not quite, 17 years; and so far as shown this use

appears to have taken place without objection on the part of Heberger or Dietz or appellee. Heberger used the mark from 1897 until his sale to appellee, and the latter has used it since then. While we think Dietz began his use of the mark as a trade-mark some years later than Heberger, still Dietz continued the use thereafter until his death, and presumably appellants have since continued such use. There does not appear to have been any objection made to these uses on behalf of what we may call the Taylor interests. Furthermore, the property and business with which Taylor was connected in making and selling washing machines was sold in March, 1902, to a syndicate. The syndicate abandoned the business, and more than a year elapsed between its purchase and abandonment of the business and Taylor's attempted sale of the mark to Dietz. Whether all this, as claimed, amounted to an abandonment of the mark or not, it certainly does not aid the claims of either side in the present suit. It is rather a token of assent to the use of the mark by the public.

The facts thus pointed out signify such a degree of laches and apparent acquiescence as to bring the case within the rules laid down by this court in Saxlehner v. Wagner, 157 Fed. 745, 85 C. C. A. 321, and by the Supreme Court in French Republic v. Saratoga Vichy Co., 191 U. S. 427, 24 Sup. Ct. 145, 48 L. Ed. 247. The only restriction, then, that can be imposed upon the use of the mark is that each user shall so identify his washing machines as clearly and conspicuously to show the name or names of the manufacturer and vendor. This restriction would prevent confusion and deception as regards other users and the public.

The question now is whether the court should do more than to make an order reversing the decision and remanding the case, with direction to dismiss. The bill charges unfair competition, and this charge was sustained in the decree below. Objection is made that the bill in this regard is defective in form, in that it does not charge Dietz with endeavoring to palm off his machines on the public as the machines of complainant. The bill does not make an averment in that form. The pleadings appear to have been framed on the theory that each party was exclusively entitled to the use of the mark, and that each was infringing upon the rights of the other.

We cannot, under the evidence, repress a feeling that relief should be granted complainant below, at least to the extent of preventing the representatives of the estate and business of Conrad Dietz, deceased, from directly or indirectly placing on the market or selling washing machines bearing either the figure of a globe or the word "Globe," without permanently affixing to each of the machines and conspicuously displaying thereon the name or names of the manufacturer and vendor. We see no reason why appellee shall not be permitted, if it desire, to amend its bill so as to admit of the granting of relief under the present record to the extent indicated, conditioned, however, that appellee shall submit to like restraint. This will be allowed upon our own motion, in analogy to the principle involved in the action of this court in making an order upon its own motion in Barber v. Coit, 118 Fed. 272, 55 C. C. A. 145.

We should not adopt this course, but for the unusual methods of

competition to which Dietz and those acting in his interest appear to have resorted, and the manifestly injurious effects that a continu-ance of such methods would have upon the business of appellee, and also in misleading the public. It is not necessary to say that we should not pursue this course, if the record revealed such methods in the con-duct of appellee. It is equally unnecessary to repeat, since the pro-posed relief shows, that we do not mean to sanction any right in ap-pellee to do anything denied to appellants.

An order will be entered reversing the decree below, with costs of this court, and remanding the cause, with direction to permit amend-ment if desired by appellee, and thereupon to enter a decree in ac-cordance with this decision, and, if such amendment be not desired, to dismiss the bill, with costs.