## G. & C. MERRIAM CO. v. SAALFIELD.

### (Circuit Court of Appeals, Sixth Circuit.   July 17, 1912.)

### No. 2,097.

**1. LIS PENDENS (§ 25\*)—BAR OF JUDGMENT—PERSONS IN PRIVITY.**

Where, pending a suit for unfair competition, another purchased and continued the business of the defendant, he became from that time in effect the defendant, and is bound by and entitled to the advantages of the decree; and where the court refused the complainant an accounting, he cannot be required to account in a subsequent suit against himself for any acts of his prior to the decree.

[Ed. Note.—For other cases, see Lis Pendens, Cent. Dig. §§ 47–57; Dec. Dig. § 25.\*]

**2. TRADE-MARKS AND TRADE-NAMES (§ 98\*)—UNFAIR COMPETITION—ACCOUNTING FOR PROFITS.**

Where unfair competition is established, an accounting should be ordered, unless it is made clearly and certainly to appear that neither upon the existing record nor upon any record which complainant can make before the master could there be any substantial recovery.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 112; Dec. Dig. § 98.\*]

**3. TRADE-MARKS AND TRADE-NAMES (§ 53\*)—INFRINGEMENT—NATURE OF INJURY.**

The entire substantive law of trade-marks, excepting statutory provisions and their construction, is a branch of the broader law of unfair competition; the ultimate offense in infringement suits being that defendant has passed off his goods as and for those of complainant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 61; Dec. Dig. § 53.\*]

**4. TRADE-MARKS AND TRADE-NAMES (§§ 11, 13\*)—UNFAIR COMPETITION—EXPIRED PATENT OR COPYRIGHT—SUBSEQUENT USE OF NAME.**

On the expiration of a patent or copyright, the situation arising with respect to the use by others of the name of the patented article or copyrighted book cannot be differentiated from that arising with respect to the use of any other descriptive word. While any subsequent maker of the article or publisher of the book has the right to use the name, because it has come to be a word of apt description, if by reason of its long and exclusive use by the original maker or publisher it has come to be indicative of his product, and he continues its use, he is entitled to protection against unfair competition in such use, and the right of another to use it is qualified by the requirement that he must accompany it with an explanation which will unmistakably inform the public that the article or book is of his production.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 15, 16; Dec. Dig. §§ 11, 13.\*]

**5. TRADE-MARKS AND TRADE-NAMES (§§ 66, 78, 98\*)—UNFAIR COMPETITION—DAMAGES AND PROFITS RECOVERABLE.**

The right to protection in the exclusive use of a trade-mark or against unfair competition, unlike that to protection from infringement of a patent, is incidental only to an existing business, and there can be no damage in connection with the violation of such right, except as there is injury to the business and good will through loss of sales or damage to the reputation of the goods. Hence complainant in a suit for unfair competition can only recover profits on the ground of such loss of sales; but it may be presumed that the simulation of complainant's goods by defendant was one of the causes which induced his sales and prevented

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sales by complainant, and where it is impossible to determine whether that or some other cause induced a sale defendant may be required to account for the profit made.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 88, 112; Dec. Dig. §§ 66, 78, 98.*

Unfair competition in use of trade-mark or trade-name, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.]

On rehearing.

For opinion on former hearing, see 190 Fed. 927, 111 C. C. A. 517.

W. B. Hale, of New York City (F. F. Reed and E. S. Rogers, both of Chicago, Ill., on the brief), for appellant.

George F. Bean, of Boston, Mass., and Lawrence Maxwell, of Cincinnati, Ohio, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge. Pursuant to the reservation in the opinion filed October 28, 1911, a rehearing has been had upon the sole question whether or not an accounting should be ordered. As reasons why this should not be done, defendant urges the Massachusetts decree as being an adjudication upon this subject, and also urges the decisions and the arguments recited by Judge Putnam and referred to in our former opinion, to the effect that, in a situation like this, an accounting can result in nothing but expense and confusion. In favor of an accounting, complainant urges: (1) That such is the usual and almost invariable practice; (2) that Judge Putnam's comments on this branch of the subject were dicta, and the legal rule is not as he thought it should be; (3) that the rule of accounting, in a case like this, should be, and is, the same as in a trade-mark case.

In addition to these matters, and in answer to the insistence of defendant's counsel that defendant has not infringed since the Massachusetts decree, complainant's counsel asserts himself to be in possession of proof showing unquestionable violations of the rule since that time, and on a considerable scale, and further asserts that, as such an accounting extends up to the date of the master's report, it is not essential that the record, on an appeal taken before an accounting is had, should disclose all of complainant's proof entitling him to an accounting, but that he may, under the prevailing practice, withhold such proof until after the interlocutory decree, or it may not come into existence until after the interlocutory decree.

[1] We have first to consider the direct effect of the Massachusetts decree. That decree was entered by the Circuit Court on April 21, 1909, pursuant to the opinion of the Court of Appeals as reported in 170 Fed. 167, 95 C. C. A. 423. The defendant in this case, Saalfield, succeeded the defendant in that case, Ogilvie, in the business, in December, 1908. That decree speaks as of its date, and, in connection with the opinion, it is an adjudication that, by reason of complainant's former misconduct, it was not entitled to an accounting against the defendant for anything done by the defendant up to that date:

We think it is the proper conclusion on this record, and we interpret our former opinion to be a conclusion, that after December, 1908, Saalfield was, in substantial effect, the defendant in the Massachusetts case, and it follows that he may take advantage of that adjudication, just as he is bound by it, and that for his alleged misconduct upon this subject-matter, committed prior to April 21, 1909, there can be now no accounting ordered against him.

[2] What, then, is the general rule as to an accounting, to be applied to defendant's acts after April 21, 1909, and under such a situation as that here disclosed? In so far as Judge Putnam's discussion is founded upon the rule in patent cases, it finds its essential support in Garretson v. Clark, 111 U. S. 121, 4 Sup. Ct. 291, 28 L. Ed. 371. This case has often, if not commonly, been understood as laying down the rule that, where it is impossible to apportion the infringer's profits between those resulting from the patented and nonpatented features of his device, it was, therefore, impossible for complainant to sustain the apportioning burden placed upon him by the rule, and hence, in such cases, that only nominal damages could be recovered. That this decision should not be so broadly interpreted is made apparent by Westinghouse Co. v. Wagner Co., 225 U. S. 604, 32 Sup. Ct. 691, 56 L. Ed. 1222, announced by the Supreme Court June 7, 1912. The rule is there stated, apparently by way of a deliberate and careful effort to clarify some of the existing confusion on the subject, that complainant satisfies the burden when he establishes that the infringer has so conducted the affair as to make impossible even an approximate or fairly estimated apportionment, and that, in such case, the infringer must account for and pay over all the profits earned upon the entire structure. If, therefore, the analogy between patent cases and cases like the present is as close as Judge Putnam supposed, and if, as he feared, the difficulties of apportioning profits or damages are here insoluble, the complainant is entitled to recover all the profits resulting from those publications by defendant which were characterized or materially affected by false indicia of origin.

The only decision in an unfair competition case which is relied upon against the propriety of an accounting in such a situation, is Ludington v. Leonard (C. C. A. 2) 127 Fed. 155, 62 C. C. A. 269. We are satisfied that such case presented a very different problem of accounting from that now involved. On the other hand, the Circuit Court of Appeals in the Second Circuit has recently ruled that an accounting must be had in an unfair competition case, where the difficulty was perhaps as great as it may be here (Florence Co. v. Dowd, 189 Fed. 46, 110 C. C. A. 608); and, applying the rule there recognized, it is sufficient for the purposes of the present case to say that the usual practice contemplates an accounting and that such practice should be followed, and an accounting ordered, unless it is made clearly and certainly to appear that neither upon the existing record, nor upon any record which complainant can make before the master, could there be any substantial recovery. If there remains any fair probability that the complainant can produce the necessary proof, or that, upon final hearing, and as aided by all such proof, the

trial court or the reviewing court may think that complainant is entitled to a recovery of damages or profits (beyond the amount of any which may be tendered, if a tender is made), then the complainant should have the opportunity to make and present his case.[1]

Applying this conclusion to this record, we find that since the final Massachusetts decree defendant has continued the publication of his books and of his advertisements in a manner which he claims fully conforms to the decree, but which complainant insists is a continued evasion, and hence violation, of the decree. The record does not purport to show defendant's conduct in this respect later than December, 1909; and complainant, if proceeding in good faith, as we are bound to presume it is proceeding, is entitled to show such later or other conduct of defendant as may be different from that developed by the record. Upon the question whether such new or other forms, differing from those shown by the present record (if any there are), are in compliance with the decree, complainant has a right to be heard.

We do not doubt that the respective rights of the parties are fixed and declared by the Massachusetts decree. This is just as much an adjudication that the complainant is not entitled to that general character of relief which it sought by its bill and failed to obtain by the decree, or to the specific items of relief contained in its draft decree proposed and stricken out on settlement (in so far as such items are not otherwise covered by the decree as settled), as it is an adjudication that complainant is entitled to the relief granted.

[3] The questions which will arise on this accounting are incidental to the application of the decree to situations subsequently existing, and such application necessarily calls for interpretation. In the decisions upon this case in the First Circuit, the opinions of the courts only undertook to apply to the facts of the case rules and adjudications that were assumed to be familiar. The interpretative conflicts which have arisen seem to make it advisable to ascertain, somewhat more completely than those courts thought their statement necessary, the principles which underlie those decisions. A trade-mark is a trade-mark because it is indicative of the origin of the goods. The original right to its exclusive use was not based upon any statute, but upon principles of equity; and the right is acquired, not by discovery or invention or registration, but by adoption and use. The entire substantive law of trade-marks (excepting statutory provisions and construction) is a branch of the broader law of unfair competition. The ultimate offense always is that defendant has passed off his goods as and for those of the complainant. Capewell Horse Nail Co. v. Mooney (C. C. A. 2) 172 Fed. 826, 97 C. C. A. 248; Elgin, etc., Co. v. Illinois Watch Co., 179 U. S. 665, 674, 21 Sup. Ct. 270, 45 L. Ed. 365. More or less confusion has arisen because it happened that the specific of-

---

[1] This court's refusal of an accounting in National, etc., Co. v. Century, etc., Co., 183 Fed. 206, 105 C. C. A. 638, and failure to award that relief in Dietz v. Horton Mfg. Co., 170 Fed. 865, 96 C. C. A. 41, are not inconsistent with the rule now announced. In the former case, the court was satisfied there could be no substantial recovery; in the latter, the point was not considered.

fense and the specific rule were recognized and a body of law grew up concerning the same before the broader and inclusive offense was recognized and defined; but this does not prevent proper classification after both are understood.

Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public and so may be used by any one of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the "secondary meaning" theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, "secondary meaning," seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning. Here, then, is presented a conflict of right. The alleged trespassing defendant has the right to use the word, because in its primary sense or original sense the word is descriptive; but, owing to the fact that the word has come to mean, to a part of the public, something else, it follows that when the defendant approaches that same part of the public with the bare word, and with nothing else, applied to his goods, he deceives that part of the public, and hence he is required to accompany his use of the bare word with sufficient distinguishing marks normally to prevent the otherwise normally resulting fraud.

The fact that a defendant is required to take this precaution demonstrates that in a very true sense his use of the word has become the secondary one; otherwise, he need not carry the burden. In this particular field, the word naturally indicates the product of the complainant, and hence defendant must do something to remove the natural impression. This view may be illustrated by reference to the Singer Case. Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. It was established as a fact that to those buying and using sewing machines the word "Singer" had come to import that the machine on which it was used was made by the Singer Company; in other words, when that part of the public saw a

sewing machine marked "Singer," its first and natural thought was that the machine was made by the Singer Company. If one who saw a sewing machine marked "Singer" would primarily and naturally accept the word as referring only to the mechanical construction of the machine according to the Singer patents, then the June Company committed no fraud by using the word without explanation, and the burden would have been upon the Singer Company further and particularly to identify its goods; but this was not the result. The whole burden was put upon the June Company.

[4] The situation arising under an expired patent or copyright cannot be differentiated from that arising with reference to any other descriptive word. There can be no trade-mark or similar exclusive right in what has been, during the life of the patent or copyright, the name of the patented article or copyrighted book, not because of any particular rule of trade-mark or patent law, but because the word, during the term of the monopoly, has come to be a word of apt description. It has come to be the name of the thing, and hence any one who later makes the thing may call it by its true name. Neither is there anything peculiar in the application of the secondary meaning theory to this class of cases. It is to be applied just as with reference to any descriptive word, and if, after the word comes into existence and becomes free to the public as the name of the thing, it is used by one manufacturer so long and so exclusively that it comes to be, to that part of the public, indicative that it is his product, he is entitled to protection for the same reasons, in the same way and to the same extent as held with reference to "camel's hair belting" (Raddaway v. Benham, App. Cas. 1896, p. 199), "Glenfield starch" (Wotherspoon v. Currie, L. R. 5 H. L. .508), "Elgin" or "Waltham" watches (Elgin Co. v. Illinois Co., supra; Am. Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263), or "Hall's safes" (Herring, etc., Co. v. Hall, etc., Co., 208 U. S. 554, 28 Sup. Ct. 350, 52 L. Ed. 616).

Exactly so, and of necessity, with regard to this copyrighted book. During the term of the copyright the proprietor has a monopoly of the article—of the book, as well as of the name. When the copyright expires, both name and book pass into the field of public right. Any future right by the publisher in the title, as against the public, must rest upon public acquiescence. As to a geographical or commonly descriptive word, this period of public acquiescence begins as soon as the proprietor adopts the word for his goods; the word being then free to the public. As to a word of which the proprietor has a monopoly by express grant, like the name of a copyrighted book, it may well be that the necessary public acquiescence cannot begin to run until the name becomes free to the public; but, however that may be, and in either case, when the acquiescence has been continued long enough and has been exclusive enough, the word comes to be indicative of origin through its thus acquired "secondary meaning." Whether it is the name of a formerly (but no longer) patented article, or is the title of a book with expired copyright, it has become the maker's or the publisher's token, and differs from a technical common-law trade-

mark mainly, if not wholly, in the fact that the proprietor's right is not of absolute, but of qualified, exclusion.

So it is wrong, in such a case, and when this "secondary meaning" is once established, to start with the premise that defendant is entitled to use the word; prima facie, viewed from this point, he is not. The right, for the purposes of such a case, is primarily vested in the complainant.[2] Defendant may not use the word at all, unless he accompanies it with the explanation; he must neutralize an otherwise false impression; he must "unmistakably inform" the public that the article is of his production (Singer Mfg. Co. v. June Mfg. Co., supra, 163 U. S. 200, 16 Sup. Ct. 1002, 41 L. Ed. 118); he must so distinguish that "no one with the exercise of ordinary care can mistake" (Saxlehner v. Eisner & Mendelsohn Co., 179 U. S. 19, 41, 21 Sup. Ct. 7, 45 L. Ed. 60): he must give "the antidote with the bane" (Herring, etc., Co. v. Hall, etc., Co., supra, 208 U. S. 559, 28 Sup. Ct. 350, 52 L. Ed. 616).

Returning from this discussion of underlying principles, let us see how they have been applied and are to be applied in this controversy. We think it clear, both from the necessities of the situation and from what was said by the courts of the First Circuit in their decisions, that their decree was based upon an application to these facts of the secondary meaning theory. It was found that the term "Webster's Dictionary" had in the minds of the dictionary public the meaning that the book so named or marked was the Merriam book; and this finding may well rest upon sufficiently exclusive use, with public acquiescence, from 1889, when the copyright expired, till 1904, when Ogilvie published. In that same connection, it was found that when the copyright expired, in 1889, any one had the right to publish a Webster's Dictionary, and to call it by that name, and, as matter of course, that the defendant might justify as licensee under this public right. It was also found as a fact that the book published by defendant was a book which, under this rule, he was entitled to call Webster's Dictionary; and this finding, like the remainder of the decree, must be accepted by both parties. It was also found that he did not have a broad and unqualified right to publish his book by this name; but his right in this respect was secondary to that of complainant, and that, consequently, when he called his book "Webster's Dictionary," *he*, the defendant, must qualify and distinguish.

The effect of the decree is not to be confined to the two styles, "Universal" and "Imperial," then published; its general terms extend as well to any other forms the defendant may publish; and it follows that in this accounting, his books, called "Inter-Collegiate," "Adequate," and "Sterling," are subject to scrutiny under the same rules as the "Imperial" and "Universal." Nor is it to be overlooked that the decree does not merely prescribe a notice for the title-pages; it forbids publishing or issuing the title-pages and backs "in their present form, or in any other form in any way calculated to deceive pur-

---

[2] Lord Westbury, in Wotherspoon v. Currie, supra, at page 522, says that the geographical name had, for the purposes of the case, become the property of the manufacturer.

chasers" into purchasing this dictionary in the belief that it is a Merriam Webster's Dictionary; and this prohibition (except so far as it may be interpreted and applied by the other parts of the decree) must be interpreted in the present accounting with reference to defendant's books. Again, the provision that the notice shall be "plainly printed" is not necessarily satisfied merely because the prescribed words are printed in legible type; it is not "plainly printed" if the page in its entirety indicates an intention to conceal the notice rather than to make it plain.

Further than this we cannot go at this time in construing the decree. We must reserve, for decision after proofs and arguments, the specific questions indicated with more or less distinctness by the present record, among which are: Whether the exterior of the book, in its use of the title or in other inscription, or in decoration or ornament, was "calculated to deceive"; whether the notice properly printed on the title-page would cure any misleading otherwise naturally caused by the exterior (if any would be so caused); whether the notice was "plainly printed" by defendant in the instances where it was used by him; whether the title qualification is required in connection with each use of the title, and in what juxtaposition; and whether "Inter-Collegiate" is of itself a violation of complainant's rights. The question to what extent, if at all, defendant's good or bad faith in what he has done in purported observance of the decree will affect the ultimate equitable liability for profits, must also be reserved.

[5] Upon the subject of profits: We think the controlling question must be whether a sale was the result of the misleading. In a patent case, and in determining the patentee's right to the infringer's profits, the loss of the sale by the complainant patentee is not vital. He may recover profits, even if he had not been manufacturing and would have been then unable to make the sale; and this is because he had a monopoly in the article itself. Not so, regarding a trade-mark and the right to protection against unfair competition; these rights are only incidental to an existing business; they cannot be independently injured or suffer damages; they do not create any monopoly in the article itself; there can be no damage in connection with violation of these rights, except as there is injury to the business and good will; and this damage can be only through loss of sales which otherwise would have accrued to the injured business (or, indeed, damage to the reputation of the goods—another subject). It follows, as applied to these books, that if the purchaser, immediate and ultimate, knew that he was not buying the Merriam book, but something different from, and claimed to be better than, the Merriam book, and thus deliberately made his choice, there is no room for any inference that complainant lost a sale as the result of defendant's misleading, and so no room for the inference that it lost any profits or that defendant received any profits as trustee for complainant.

Where the title was not qualified as the law and the decree required (if such cases appear), and it further appears, by direct proofs or by necessary inference, that it is impossible to determine whether this unlawful title use was the inducing cause of the sale—in other words,

when it appears that such title was one of the causes, and it is impossible to apportion between that and other causes, the credit for the sale—then (and if we are to adopt the analogy of the patent cases) there must be a presumption that the sale results from the unlawful use of the name. The defendant has confused the marking and dress, which he had a right to use, with those which, as against complainant, he had no right to use. The latter part is a material, if not the major, part of the whole. If the history of the sale cannot be more definitely ascertained and followed, and so it is impossible to say which part of the dress exercised the predominant influence, then under the principle of Westinghouse Co. v. Wagner Co., the defendant must respond.

The correlative is equally true. If books which offend only by bearing the title bear also the required qualification, there could, from their dress alone, be no inference that their sale was the result of unfair competition. Nevertheless, if it could be shown that such a book was in some other effective manner represented to be complainant's book, and was bought by reason of such misleading, such sale would be equally an invasion of complainant's rights.

Not only does this result follow from adopting the analogy of the patent law, but we take this to be the rule also of the trade-mark cases; and when some of them declare that the defendant must respond for his profits on every article which bore the trade-mark stamp upon it, they intend to go no further than to say that such marking raises a presumption that the sale thereof was effectuated by this false marking or unfair competition. They are not inconsistent with the disputable character of this presumption. In many cases, probably in the typical case, it would be practically impossible to dispute the presumption, because, even if it appeared that the first purchaser, like the wholesaler or dealer, knew what he was buying, this would not, of itself, affect the presumption of a fraud upon the ultimate consumer or user; but, even in the case of a technical trade-mark, if every purchaser, immediate and ultimate, knew that he was getting the counterfeit, and not the genuine, and bought it because he preferred the counterfeit to the genuine, there would be no liability for profits. We find nothing inconsistent with this limitation in the reported trade-mark cases.[3]

It follows that, except for the question of ultimate liability above reserved, the complainant will be entitled to defendant's profits upon sales of books which did not substantially comply with the decree, if

[3] Saxlehner v. Eisner & Mendelsohn Co. (C. C. A. 2) 138 Fed. 22, 70 C. C. A. 452; Fairbank Co. v. Windsor (C. C.) 118 Fed. 96. See 124 Fed. 200, 61 C. C. A. 233. In Atlantic Co. v. Rowland (C. C.) 27 Fed. 24, it was found as a fact that complainant would have made the same sales. If Regis v. Jaynes, 191 Mass. 245, 249, 77 N. E. 774, is to be taken as holding that in such a case defendant is not entitled to show that the ultimate purchaser deliberately and intelligently selected defendant's goods as against plaintiff's, such holding is not supported by the cases cited, and is inconsistent with the underlying principle stated by Chief Justice Fuller to be that "the essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another." 179 U. S. 665, 674, 21 Sup. Ct. 270, 274 (45 L. Ed. 365).

it is made to appear, and in the instances where it is made to appear, that it is impossible to apportion the credit for the sales, as well as in those instances where it does sufficiently appear that the sale was due to such noncompliance. In this connection it is apparent that defendant will not be liable, even where the books did not comply with the decree, in so far as he may show that the final purchasers intelligently and knowingly intended to buy defendant's book and not the plaintiff's.

Complainant will also (with the same exception above reserved) be entitled to recover defendant's profits upon sales, if any there be, of books which did not violate the decree directions, but which sales were the result of a belief that the books were the Merriam publication, actively induced by defendant through some misleading means beyond the mere use of the name. Upon this subject, the burden must be on complainant to establish such misleading and the reasonable probability that the sale resulted therefrom.

Complainant may show upon the accounting, if it can, that excepting for the misleading, it would have made specific sales which defendant did make, and show its damages by way of loss of profits. If such cases are established, the question of the proper disposition of defendant's profits and complainant's lost profits on the same sales can be disposed of in regular course.

The present record sufficiently indicates that there is no computable basis, if there is in fact any basis, for damages to the reputation of complainant's books by reason of defendant's publications, and the accounting should not attempt to cover that subject.

With the views which we have expressed concerning the book itself and the theory of recovering profits in such cases, we do not now see that the general advertising, if tested by the rules adopted, and if found unfair, can constitute any independent basis of recovery; but it may serve as evidence tending to show, generally or in specific instances, whether purchasers were misled by defendant, or whether they were fairly informed as to the identity of the book. Whether it may prove a sufficient basis for any conclusion on this subject cannot now be determined.

In the former opinion, the injunction was directed to be in the same form as that finally entered in Massachusetts. It was, of course, intended that such modifications should be made as to fit the form to this case. So modified, it will read as follows:

"That a perpetual injunction issue in this suit restraining defendant, Arthur J. Saalfield, his agents, attorneys, servants, employés, and all persons claiming or holding through or under him, from using as the name or title of his said dictionaries described in the bill herein, to which this litigation relates, the words 'Webster's Dictionary,' or 'Webster's Imperial Dictionary,' or 'Webster's Universal Dictionary,' or 'Webster's Inter-Collegiate Dictionary,' or 'Webster's Adequate Dictionary,' or 'Webster's Sterling Dictionary,' or any equivalent thereto upon the title-page or upon the back or cover of said dictionaries, or in any advertisement, circular, notice, or announcement referring to said dictionaries, unless accompanied by the following statement plainly printed upon the title-page and in each said advertisement, circular, notice, or announcement, viz.: 'This dictionary is not published by the original publishers of Webster's Dictionary or by their successors'—and especial-

ly from publishing or issuing in the form used by George W. Ogilvie with reference to certain of said dictionaries the title-pages and backs of said dictionaries and the circulars and advertisements adjudged misleading or deceptive by the United States Circuit Court for the District of Massachusetts, in the suit wherein the complainant herein and George W. Ogilvie were parties, or any other form of title-page, back, circular, or advertisement that is in any way calculated to deceive purchasers into purchasing defendant's dictionary under the belief that it is a Webster's Dictionary published by the complainant."