JULES BENGUE and Others, Plaintiffs, *v.* AMERICAN PHARMA-
CEUTICAL COMPANY, INC., and Another, Defendants.

Supreme Court, New York County, May 18, 1935.

*Freauff, Robinson & Sloan* [*Robert Burns, S. Lawrence Miller*
and *A. Edward Bean* of counsel], for the plaintiffs.

*Nathan Burkan* [*Louis D. Frohlich, Herman Finkelstein* and
*Irving Moross* of counsel], for the defendants.

COLLINS, J.   By this action it is sought to restrain the defend-
ants from competing unfairly with the plaintiffs.   The basic plaint
is that the defendants are practicing fraud by utilizing the name
which, by long and constant use and vast and expensive adver-

tising, had become, and still is, associated by the public as describing and identifying the plaintiffs' product, and by so dressing the defendants' article, and so setting it, that the defendants' product is palmed off for that of the plaintiffs'.

In 1896 the plaintiff, Dr. Jules Bengué, a physician and pharmacist of France, compounded menthol, salicylate of methyl and lanolin into a salve theretofore unused and unknown, to which preparation he gave the designation " Baume Analgésique Bengué," French words meaning " healing balm." Two years later Dr. Bengué came to the United States where he launched a branch business and embarked upon the manufacture and sale of " Baume Analgésique." Not only was there no pharmaceutical preparation then known in this country by that name, but no emollient containing the elements of menthol, salicylate of methyl and lanolin was being marketed or even manufactured here.

As was its history in France, the preparation soon won favor here. It prospered.

In 1899 the plaintiff Theodore Seltzer was appointed Dr. Bengué's agent in this country, and the third plaintiff, Thos. Leeming & Co., became the sole American distributor of the preparation. The product was marketed here in a telescoped brown and white cardboard box, approximately four and one-half inches long, one and three-fourths inches wide and one inch deep. The box was labeled " Baume Analgésique Bengué," and the tube, as well as a circular inclosed in the box, bore substantially the same legend.

For a period of about twenty years the advertising of the preparation was confined to hospitals and physicians and medical publications. The extensive public advertising came later.

Up to about 1908 no similar preparation was marketed, but that year Parke, Davis & Co. marketed a like article called " Analgesic Balm," whereupon the plaintiff Leeming commenced to warn their (plaintiffs') customers of imitations.

In 1918 Leeming began to advertise the preparation generally through the medium of newspapers and street car cards, about $2,000,000 having been spent here by the plaintiffs in that connection. In 1918 the inscription " The Original French Product " appeared underneath the legend " Baume Analgésique Bengué," and from 1922 " Baume Analgésique Bengué was altered to " Baume Bengué (Analgésique)," "(Analgésique)" appearing in smaller type than " Baume Bengué." In 1928 the plaintiffs unfurled the slogan: " Always ask for the genuine in the brown and white box." Again, in 1933, " The Original French Product " was supplanted by " The Original French Analgésique Baume," and the phrase " Ben-Gay " in red letters, was added.

From its inception the preparation was given a French setting; it appeared in a French atmosphere; constantly, and in various ways, the idea that the product was of French origin was propagated and impressed upon the public. And the public came to know and demand the preparation as a French product. They knew it as " Baume Analgésique." However they pronounced or mispronounced it, the public became acquainted with the healing balm as a French invention and this familiarity was created by the plaintiffs with *their* product.

From 1898 to 1929 no other preparation than the plaintiffs' was marketed in this country under the name " Baume Analgésique."

In 1932 — thirty-four years after the entry of the plaintiffs' product in the United States — the defendants marketed a preparation which they labeled " Baume Analgesique." The initials " A. P. C.," in small type, appeared underneath. This product, too, was and is marketed in a tube contained in a box the precise size and color as that of the plaintiffs', although the defendants' house color had been golden-rod and brown. On the defendants' box in large letters are the words " French Formula " and " Genuine." Patently, the general color scheme adopted by the defendants simulates that of the plaintiffs'. The defendants, who have made virtually no expenditures for advertising, are thus enabled to sell their product to the trade at two dollars and forty cents a dozen, whilst the plaintiffs' product is sold at six dollars a dozen. In 1931 the plaintiffs sold about 2,500,000 tubes; but the sales have decreased since the defendants' competition.

I have not essayed to chronologize the facts or to particularize the salient evidence. But it is transparent that the marketing of the two compounds, similarly named and embellished, has occasioned not only confusion but deception.

The answer to the query whether the defendants are competing unfairly with the plaintiffs resides in the facts etched. These facts carry their own conclusion. To state the issue is to resolve it. The juxtaposition of the respective exhibits alone dictates the judgment.

Let it be emphasized that this case should not be confused with copyright cases. Accordingly, many of the citations advanced by the defendants, involving, as they do, technical questions pertaining to copyright, have no pertinency here. The present concern is with the application of the far-flung principles of equity to the fairness and legitimacy of the competition between these litigants. (*Coats* v. *Merrick Thread Co.*, 149 U. S. 562.)

" The law of unfair competition is of comparatively recent origin. It is the necessary creation of intensive business rivalry which often incites unfair methods. Whilst the books contain a multitude of

cases bearing on this branch of equity, the principles governing them are simple, as, indeed, are the fundamental rules of honesty and fair dealing. The essence of these principles is that competition between business rivals must be fairly and honestly conducted. ' The survival of the fittest ' in trade and commerce must result from contests legitimately launched and ethically directed.

" Of course, the law does not undertake to regulate every aspect of business. Nor does it interfere in every case of commercial immorality. Too much interference would be as baneful as an inflexible policy of absolute non-interference. Necessarily, there must be limitations and guiding rules, and, necessarily, each case must depend for sustenance upon its own larder." (*American Chain Co., Inc., v. Carr Chain Works, Inc.*, 141 Misc. 303, 306, 307.)

" The doctrine of unfair trade amounts to no more than this: One person has no right to sell goods as the goods of another, *nor to do other business as the business of another*, and on proper showing will be restrained from so doing." (*White Studio, Inc., v. Dreyfoos*, 221 N. Y. 46.)

When we apply this simple doctrine of honesty to this case, the issue is determined.

The defendants insist that the words " Baume Analgésique," meaning " analgestic balm," are descriptive, that they accurately and truthfully describe the defendants' compound as well as the plaintiffs' and that, therefore, the plaintiffs can acquire no such monopoly in these words as to prevent their adoption by others. But the law of unfair competition is strewn with cases wherein common, descriptive or generic words, so used as to become associated with a particular product of a particular manufacturer, have been held to constitute exclusive appropriation. (*Elgin Nat. Watch Co. v. Illinois Watch Co.*, 179 U. S. 665; *Fishel & Sons v. Distinctive Jewelry Co., Inc.*, 196 App. Div. 779; *Kayser & Co. v. Italian Silk Underwear Co.*, 160 id. 607; *German-American Button Co. v. Heymsfeld, Inc.*, 170 id. 416; *Shaver v. Heller & Merz Co.*, 108 Fed. 821; *Standard Oil Co. of New Mexico v. Standard Oil Co. of California*, 56 F. [2d] 973.)

The circumstance that the words " Baume Analgésique " accurately describe the defendants' mixture does not authorize the defendants to employ them in such a manner as to pass off their compound for that of the plaintiffs. (*Mainzer, Inc., v. Gruberth*, 237 App. Div. 89; *Merriam Co. v. Saalfield*, 198 Fed. 369.)

To contend that common or descriptive words may not, by long and constant association with a given product, acquire such a meaning in the public mind that another may not be stayed from employing the same legend, is to contend for the non-existence of

the doctrine of secondary meaning. The consequence would be the unharnessing of competition; commercial rivalries would become vendettas.

Despite all the words in the English dictionary available to the defendants, they resorted to the French and commandeered the precise words employed by the plaintiffs for more than three decades. Obviously, this duplication of name was not a mere accident or coincidence. The honest policy, the forthright course for a merchant who believes in his product, to pursue, is to avert confusion and deception by avoiding duplicating a name. The defendants' motive for adopting for its compound the legend " Baume Analgésique " was not legitimate or honest. The manifest design was to feed upon the reputation, the good will and the advertising of the plaintiffs.

Since the defendants spent practically nothing in advertising their compound, by what process could the public know their product? The public knows what is made known to it. The demand for this compound was created by the plaintiffs. Therefore, to permit the defendants to garner the crop sown by the plaintiffs would not only sanction unjust enrichment, but would operate as a fraud on the public.

The defendants protest that the plaintiffs adequately distinguish their product from those of other manufacturers by emphasizing " Bengué " or " Ben-Gay." But this overlooks the simulation of dress. (*Winterton Gum Co.* v. *Autosales Gum & C. Co.*, 211 Fed. 612.) More, in these cases the law does not split hairs or indulge in specious niceties, because the law knows that the public does not make such fine distinctions. The public mind attaches to, and is influenced by, *general* appearances; the public eye is attracted by *similarities* rather than precise and detailed duplication; the public ear is attuned to phonetics rather than to accurate pronunciation. (Nims on Unfair Competition and Trade-Marks [3d ed.], p. 833.) It is what the public knows or thinks that controls. (*Coca Cola Co.* v. *Boas*, 27 F. [2d] 756; *Thum Co.* v. *Dickinson*, 245 Fed. 609; *Denver Chemical Mfg. Co.* v. *Lilley*, 216 id. 869; *McLean* v. *Fleming*, 96 U. S. 245; *Dutton & Co.* v. *Cupples*, 117 App. Div. 172.) The " general appearance of the package " is the pivot (*Reckitt & Sons* v. *Kellog*, 28 App. Div. 111) for it is the ensemble that arrests. (*Fischer* v. *Blank*, 138 N. Y. 244.)

Naturally, the American public is more easily beguiled when the article has a French name. And the drafting by the defendants of the slogans " French Formula " and " Genuine " abets the deception that the defendants' product is the compound introduced to this country and popularized by the plaintiffs. " In the interest

of common honesty and fair dealing, the courts naturally frown upon such practices." (*Mainzer, Inc.,* v. *Gruberth, supra.*)

To maintain that the defendants' reasons for designating their product "Baume Analgésique," and dressing it to resemble the plaintiffs' article, are valid or legitimate, stultifies reason, outrages common sense and disregards the obvious. "The entire scheme was resorted to in order to unfairly compete with the plaintiff." (*Brillo Mfg. Co.* v. *Levine,* 236 App. Div. 488, 490.)

If all the defendants seek is to give their compound a name that is descriptive and one which the American public will instantly understand, let them employ the English words, "Healing Balm." Why give their compound, sold in the United States, a French nomenclature? (*Pinaud, Inc.,* v. *Huebschman,* 27 F. [2d] 531; affd., Id. 538.) And why imitate the plaintiffs' color combination? (*Brillo Mfg. Co.* v. *Levine, supra.*)

The evidence is persuasive that there has been deception; the defendants' product has been bought and sold as that of the plaintiffs'. Even in instances where druggists have retailed the defendants' product to customers who thought they were purchasing the French product made known to them by the plaintiffs, the instrumentality to deceive was created and placed in motion by the defendants. If the trap was used by a retailer it was contrived and set by the defendants. (*Fairbank Co.* v. *Bell Mfg. Co.,* 77 Fed. 869.) The other points presented by the defendants have been considered and deemed meritless.

Viewing the case in its entirety, I am convinced that the facts here lustily demand the wielding and effectual application of the recent clarion admonition by MARTIN, P. J., in his robust dissenting opinion in *Smith Co.* v. *American Pharmaceutical Co., Inc.* (244 App. Div. 702 ), "that unfair competition will not be tolerated, that commercial piracy must stop." And "all opportunity to continue" the practice "in any form should be prevented by an injunction sufficiently broad to insure such a result." (*Mainzer, Inc.,* v. *Gruberth, supra.*)

Accordingly, judgment is awarded for the plaintiffs. Findings of fact and conclusions of law passed upon. Submit decision and judgment.