LEVY et al. v. WAITT et al.

(Circuit Court of Appeals, First Circuit. May 15, 1894.)

No. 81.

TRADE-MARKS—ACQUISITION—OCCUPATION OF MARKET.

Complainants applied a name, widely known by reason of local geographical uses, to small lots of cigars manufactured and sold by them,—one in 1878, on a special order; one in 1884, in competition with a trademark for a limited market; one in 1885; and no more until 1889. Before the sale in 1885, defendants, without knowledge of what had been done by complainants, and in good faith, began the sale of cigars of their own manufacture under the same name, and continued extensive sales and advertisements thereof for five years without question. *Held*, that there was no such appropriation or actual occupation of the market by complainants as to entitle them to assert a right to a trade-mark, as against defendants. 56 Fed. 1016, affirmed.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

This was a suit by Amand Levy and others, constituting the firm of Levy Bros., against Henry Waitt and others, constituting the firm of Waitt & Bond, to restrain the alleged infringement of the trade-mark "Blackstone," as applied to cigars. The bill was dismissed. 56 Fed. 1016. Complainants appealed.

George L. Huntress (Morris S. Wise, on the brief), for appellants.

Payson E. Tucker and George C. Abbott, for appellees.

Before PUTNAM, Circuit Judge, and NELSON and WEBB, District Judges.

PUTNAM, Circuit Judge. The Reverend Mr. Blaxton, or Blackston, suggested a name which has become a favorite one for local geographical uses. A well-known street in Boston, on which two of the parties named in the controversy in this case conducted their business; a river, partly in Massachusetts and partly in Rhode Island (not of the first order, but so lined with manufactories and villages that it is well known throughout the United States); a canal following the line of that river (now almost a tradition, but formerly as well known as the river itself); a considerable town in the former state; and many local corporations,—bear the name of "Blackstone." From the best view of the facts of this case which could be taken for all, A. P. Holley & Son, Waitt & Bond, the defendants below, and Levy Bros., the complainants below, each without the knowledge of the acts of the others, and contrary to the caution of the courts, usually disapproving of the use of widely-known geographical names as trade-marks, of which the last example of importance is Mill Co. v. Alcorn, 150 U. S. 460, 14 Sup. Ct. 151, adopted for cigars the word "Blackstone,"—A. P. Holley & Son, for the local market at and about Woonsocket, in the state of Rhode Island; Waitt & Bond, originally for Boston and the New England states; and Levy Bros., originally for New York and the west. It is not necessary for the court to decide now whether, under the circumstances of this case, this use of a geographical name for the several limited markets described could be protected by the law, as was

done in Mouson v. Boehm, 26 Ch. Div. 398. Nor, in the view we take, need we consider the origin of the alleged rights of A. P. Holley & Son.

Levy Bros. claim priority. In 1878 they manufactured, on a special order, 5,000 cigars, with some samples, applying to them the name in question. These were intended for one Thompson, who was then doing business on Blackstone street, in Boston, and who ordered the cigars either through A. R. Mitchell & Co., of Boston, or from them; A. R. Mitchell & Co. being then either the selling agents of Levy Bros., or the only parties at Boston to whom Levy Bros. made sales of their goods. It is claimed that on this occasion this use of the name was suggested by Thompson, and that it belonged to him, rather than to Levy Bros. Thompson did not accept the cigars, and they were soon after sold by A. R. Mitchell & Co., either on their own account, or on account of Levy Bros. In the view we take of the law of trade-marks, it is not necessary to determine either of the foregoing alternative propositions, some of which came under consideration in the important case of Paine v. Breweries (1893) 2 Ch. Div. 567. No further sales of any cigars with this name were made by Levy Bros. until 1884. They claim that in the interval they kept samples on hand; but, as the cigars were not actually put on the market during the intervening period, the court considers this inconsequential, under the rules which we will hereafter state. It is undisputed that A. P. Holley & Son sold cigars under the trade-mark of "Blackstone" as early as 1881, in and about Woonsocket; and in 1884 Levy Bros. sold, either to or through A. R. Mitchell & Co., a lot of 5,000 cigars, ordered by one Cook, who also lived at Woonsocket, undoubtedly for sale in competition with the cigars of A. P. Holley & Son and in their market. The rules which we will hereafter explain make it clear that the transaction of 1878 did not establish in Levy Bros. an exclusive right, against Waitt & Bond, to the trade-mark now in dispute, and that, as the sale of 1884 occurred after the long interval of six years, it had only the effect of an incipient transaction. Moreover, as it operated as a direct interference with the market of A. P. Holley & Son, which had certainly been established as early as 1881, it was ineffectual for that reason, if for no other. Another lot of 5,000 cigars was manufactured during the same year (1884) by Levy Bros., intended for the same Cook, but they were not taken by him; and they remained in the hands of A. R. Mitchell & Co., undisposed of, until some time between the beginning of May, 1885, and the latter part of July, 1885, when they were sold by them. At the time of this sale, Waitt & Bond had already put on the market their own cigars with the name "Blackstone." Subsequent to the sale in 1884, Levy Bros. claim to have kept samples on hand, but as to that claim we make the same observations which we have made with reference to the claim touching samples between 1878 and 1884.

In April, 1885, Waitt & Bond, who were large manufacturers of cigars, doing business on Blackstone street, in Boston, put on the

market cigars of their own manufacture, with the name "Blackstone," in ignorance of what had been previously done by Levy Bros. touching the same name, and in good faith. This was not a mere experiment on the part of Waitt & Bond, but was continuously followed by extensive sales and extensive advertisements, the sales amounting in 1885 to 412,142 cigars; in 1886, to 1,151,252; in 1887, to 1,488,136; in 1888, to 2,731,560; in 1889, to 5,386,096; in 1890, to 8,291,366. As already stated, their market was in Boston and New England. In 1889, Levy Bros. commenced the continuous manufacture and sale of cigars under this name, and have manufactured and sold the same from that time to the present in very considerable amounts, mainly in New York and the west. Their bill in the present case was filed November 12, 1890, and contains the following allegations:

"And the complainants further say that, until they found a market for their said genuine Blackstone cigars in the city of Boston, the complainants had never known or heard of a cigar other than their own being sold under the name of, and known as, the 'Blackstone Cigar;' but in the summer of 1889 the complainants learned for the first time that a cigar purporting to be made by the defendants was being sold throughout New England, and particularly in the city of Boston, under the name of, and known as, the 'Blackstone Cigar.' Thereupon, the complainants at once caused an investigation to be made, and found, and therefore charge, that subsequent to the adoption by the complainants of the name or mark of 'Blackstone Cigars,'" etc.

The record shows that on July 26, 1889, Levy Bros. wrote Waitt & Bond a letter, which, with the correspondence which followed, would be sufficient, if their rights were in other respects perfect, to lay a claim as of that date.

On the best theory of the facts for the complainants, the case stands as follows: In 1878 complainants manufactured and sold one lot of 5,000 cigars, and some samples, under the name in question; in 1884, another lot of 5,000; another lot in 1885, after Waitt & Bond commenced the manufacture and sale under the same name; and no more, proved to the satisfaction of the court, until 1889. Meanwhile, in April, 1885, Waitt & Bond commenced the sale and manufacture under the name in question, and carried on the same continuously and extensively, as already explained. If there was any suggestion that Waitt & Bond knew the facts as shown by Levy Bros., and had surreptitiously made use of a name which they were well aware Levy Bros. claimed as their own, although they had not put it on the market, except as stated, there might be some ground for an equity against Waitt & Bond; but we believe no case can be found where, with intermittent offers of merchandise bearing a certain name, with such long lapses on the one side, and on the other the uninterrupted and innocent use of the same name for five years without question, and a consequent growth of an extensive and valuable business, the equity courts have interfered in favor of the former against the latter. The extensive dealings of Levy Bros., together with the fact of their relations with A. R. Mitchell & Co., whatever they were, making, through all these years, large sales of the cigars of Levy Bros. in the city of Boston, raise such a violent

presumption against Levy Bros. as to the probability of their knowledge of the course of trade of Waitt & Bond touching this cigar as renders it difficult for this court to accept as true the claim that Levy Bros. were ignorant thereof, and did not acquiesce in it. However, we do not intend to rest this case on mere presumptions, on the doctrine of laches, or on that of abandonment, which latter was so fully argued. We rest it on the conclusion that Levy Bros. never acquired any right, sufficient to enable them to assert it to the detriment of any one using the name "Blackstone" under the circumstances, and at the time, under and at which it has been used by Waitt & Bond.

It seems to have been assumed in the discussions of this case that the common-law right to a trade-mark comes more from selection or discovery than from actual occupation of the market. Browne on Trade-Marks, at various points, is relied on; and, among other expressions found therein, the following, in section 52, is stated as though it constituted the whole rule, and required no limitation:

"That is, how long does it take to adopt it? The answer is obviously this: The moment one who has selected a symbol to indicate his merchandise applies the mark to his goods, the act is complete. The avowal of his intention to adopt, his registration of the mark, and notice to the whole world, do not constitute adoption; but apply the mark to the articles for sale, and, eo instanti, the act is complete."

It may be that, according to the letter of this citation, the selection of the name "Blackstone," with a single sale, would have been sufficient to confirm in Levy Bros. the exclusive right to its use; and this independently of all questions which might arise from the fact that A. P. Holley & Son, Waitt & Bond, and Levy Bros. were practically occupying different markets. But this is not the law. The right to a trade-mark at common law must not be confused, as it too frequently is, with the prima facie right existing under registration statutes. It arises to such a limited extent from the mere matter of selection or discovery of the name or symbol used, that this may be of trivial consequence. A singular illustration of this fact is found in Siegert v. Findlater, 7 Ch. Div. 801, where, as applied to Dr. Siegert's bitters, the word "Angostura," indicating the place of their origin, was not selected by him as his trade-mark, but, instead thereof, the words "Aromatic Bitters," to which he added a statement that the bitters were prepared by him at Angostura. The public, however, applied to them the words "Angostura Bitters;" so that, by the act of the public, those words became the usual designation of the article, which the court protected in the case referred to. In the well-known Trade-Mark Cases, 100 U. S. 82, in which the court held the first trade-mark registration statute to be unconstitutional, it said (page 94):

"The ordinary trade-mark has no necessary relation to invention or discovery. The trade-mark recognized by the common law is generally the growth of a considerable period of use, rather than a sudden invention. It is often the result of accident rather than design," etc.

Other positive expressions follow on the same page.

The opinion of Vice Chancellor Sir W. Page Wood, in Collins Co. v. Brown, 3 K. & J. 423, is a very good compendium of the

common law of trade-marks. So far as the case at bar is concerned, the vice chancellor expresses the principles and limitations of that branch of the law in the following words (page 427):

"The simple question in these cases is, has the plaintiff, by the appropriation of a particular mark, fixed in the market where his goods are sold a conviction that the goods so marked were manufactured by him; and if so, and if no one else has been in the habit of using that mark, another man has not the right to use that mark, so as to commit the fraudulent act of palming off his own goods as being the goods of the person who is known to have been in the habit of using it."

Many authorities could be cited, illustrating and approving these rules, and with them the principle that it is a fundamental basis of a right of action for the violation of a trade-mark that the public has been defrauded, or may be. It is frequently said that private rights in a trade-mark are only incidental to the prevention of public fraud. This peculiarly illustrates the force of the truth that, prior to the use of the name "Blackstone" by Waitt & Bond, Levy Bros. had neither made any appropriation, nor fixed in the market any conviction on the part of the public, within the terms of the citation from Vice Chancellor Wood,—especially, not to such an extent that there was any possibility of the public being defrauded by others' use of the name. Of course, we do not determine whether, if there had been by one person a willful use of a name which had been in good faith selected by another, and experimentally put on the market, or even put on the market at long intervals, as in the case at bar, equity would not interfere, or what, under the other circumstances of this case, would have been the result, if the sales by Waitt & Bond had been only experimental; but as against innocent parties, who have, through a period of years, built up an extensive business, it is clear that Levy Bros. had not, on any view of the facts, brought themselves within the law. It is therefore plain that the conclusions of the circuit court were correct. The decree of the circuit court is affirmed.