## HANOVER STAR MILLING CO. v. ALLEN & WHEELER CO.

(Circuit Court of Appeals, Seventh Circuit. April 21, 1913.)

No. 1,926.

1. TRADE-MARKS AND TRADE-NAMES (§ 95*) — SUIT FOR INFRINGEMENT OF TRADE-MARK—GROUNDS.

The property right of a complainant which may be protected by a suit to enjoin infringement of a trade-mark is not in the mark itself, in which he has no exclusive right except as appendant to his business, but the basis of the suit is the injury to his trade, business reputation, and good will by the fraudulent use of the trade-mark which constitutes his "commercial signature," and hence where there has been no actual fraud, and no injury to them has resulted from or is threatened by defendants' acts, there is no ground for an injunction.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. § 95.*]

2. TRADE-MARKS AND TRADE-NAMES (§ 79*)—SUITS FOR INFRINGEMENT AND FOR UNFAIR COMPETITION—IDENTITY OF GROUNDS.

In trade-mark and unfair competition cases, the ground of action and the reason for the remedy are identical. They are all cases of unfair competition in trade, and the remedy is to tie the hands of the unfair trader, and to the extent that differences exist they pertain, not to the underlying principle, but to the methods and degrees of proof required to enforce the principle.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 89, 90; Dec. Dig. § 79.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 95*)—SUIT FOR INFRINGEMENT—PROOF REQUIRED.

Since trade-mark and unfair competition cases are the same in nature and principle, the basis of both being fraudulent competition, actual competition must be shown in a suit for infringement of a technical trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. § 95.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 31*)—TERRITORIAL LIMITATION.

Since it is the trade and not the mark that is to be protected, a trade-mark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by the use of the mark; but the mark of itself cannot travel to markets where there is no article to wear the badge and no trader to offer the article.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 35; Dec. Dig. § 31.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 95*)—SUIT FOR INFRINGEMENT—RIGHT TO RELIEF.

Complainant, an Ohio Milling Company, since 1872 has used the name "Tea Rose" as a common-law trade-mark for one of its brands of flour, but has never sold such brand in the territory southeast of the Ohio river comprising the states of Georgia, Florida, Alabama, and Mississippi, although it has recently made some effort to establish a trade there in other brands. Defendant, without knowledge of its prior use by complainant, since 1895 has used the name "Tea Rose" for one of its own brands of flour in which it has built up an extensive trade in the states named, where the name has come to mean defendants' flour and no other kind. *Held*, that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
208 F.—33

complainant was not entitled to an injunction to restrain defendant from using the name in such territory.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 108; Dec. Dig. § 95.*]

6. APPEAL AND ERROR (§ 954*)—PRELIMINARY INJUNCTION—DISCRETION.

Though an order granting or denying a preliminary injunction will not be disturbed except for an abuse of discretion, a proper discretion does not include the misapplication of the law to conceded facts.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3818–3821; Dec. Dig. § 954.*]

Appeal from the District Court of the United States for the Eastern District of Illinois; Francis M. Wright, Judge.

Suit in equity by the Hanover Star Milling Company against the Allen & Wheeler Company. From an order granting a preliminary injunction, defendant appeals. Reversed.

Henry Fitts, of Birmingham, Ala., Edgar L. Clarkson and Jas. E. Morrisette, both of Tuscaloosa, Ala., and Louis Clements, of Danville, Ill., for appellant.

L. O. Whitnel, H. L. Browning, and Thos. E. Gillespie, all of East St. Louis, Ill., and J. Fred Gilster, of Chester, Ill., for appellee.

Before BAKER, Circuit Judge, and ANDERSON and SANBORN, District Judges.

BAKER, Circuit Judge. This is an appeal from a preliminary injunction. Bill, affidavits, counter affidavits, and exhibits disclose the following facts:

Complainant (appellee), an Ohio corporation, owns and operates a flour mill at Troy, Ohio. Since 1872 it has used the words "Tea Rose" as a common-law trade-mark to designate one of its makes of flour. Though its bill and affidavits say generally that its trade extended throughout the United States, the only particulars exhibited disclose that its trade was within the territory north of the Ohio river. And the showing of defendant clearly establishes, on the present record, that complainant never had any trade in its "Tea Rose" brand in the southeastern territory comprising Georgia, Florida, Alabama, and Mississippi. In recent efforts to establish a trade in said southeastern territory, complainant has used only its "Trojan" and "Eldean Patent" brands. Complainant did not learn until in 1912, shortly before the bringing of this suit, that defendant had built up and was conducting an extensive trade in a "Tea Rose" brand of flour throughout said southeastern territory.

Defendant is an Illinois corporation, owning and operating a flour mill at Germantown, Ill. Continuously since 1893 defendant has used the words "Tea Rose" in marking its flour sacks. Beginning in 1904 defendant conducted an active campaign to build up a large trade in its "Tea Rose" flour in said southeastern territory, with the result that when this suit was filed defendant's sales of "Tea Rose" flour in that market amounted to more than $150,000 a year. Defendant adopted "Tea Rose" as its mark in perfect good faith, with no knowledge that

any one else was using or had used those words in such a connection. In the flour trade in said southeastern territory the mark "Tea Rose" has come to mean defendant's flour, and nothing else.

If this were what is commonly known as an "unfair competition" case in distinction from a technical "trade-mark" case, complainant could not be given any relief for two reasons: (1) There is not and never has been any competition between the two flours in the same markets, hence no "unfair" competition, no palming off of defendant's flour as complainant's, no trespass committed or threatened upon complainant's established good will. And (2) if the words "Tea Rose" were open to common use, like the family name of the maker or the geographical designation of the place of manufacture or words descriptive of the grade of the goods, the make-ups of the two bags are so distinctive in color, lettering, wording, and names and addresses of makers, that, from a comparison alone, it could not be found that confusion would be likely to result. On the facts as now presented this case therefore turns on the correctness of complainant's insistence that, the words "Tea Rose" being proper for adoption as a technical trade-mark, and complainant having appropriated the mark and applied it to its flour, thereby complainant acquired the mark as its property and had the right to exclude others from using it in the flour trade throughout the territory of the United States, irrespective of the questions of how far complainant's trade, reputation, and good will actually extended, and whether defendant had interfered or was threatening to interfere with complainant's established business.

Use of an arbitrary and distinctive mark to indicate the origin or ownership of articles of trade—the dealer's "commercial signature"— is very old. It may have begun because the general run of consumers of those ancient times could not have read the dealer's business name and address if he had written them upon his articles in the vernacular. And throughout, the question whether or not a trade-mark is property has often been mooted. Lord Langdale, in Perry v. Truefitt, 6 Beav. 73: "I own it does not seem to me that a man can acquire a property merely in a name or mark." Vice Chancellor Sir W. Page Wood, in The Collins Co. v. Brown, 3 K. & J. 423: "It is now settled law that there is no property whatever in a trade-mark." Lord Herschell, in Reddaway v. Banham, A. C. (1896) 199: "I doubt myself whether it is accurate to speak of there being property in a trade-mark." On the other hand, the books are full of cases in which by implication or direct statement it is declared that trade-marks are property. But the dispute is only apparent; the minds of the various courts are found to be in accord when the basis of the cause of action and the reason for granting injunctive relief are considered.

In Perry v. Truefitt, supra:

"I think the principle upon which both the courts of law and of equity proceed in granting relief and protection in cases of this sort is well understood. A man is not to sell his own goods under the pretense that they are the goods of another man. He cannot be permitted to practice such a deception, nor to use the means which contribute to that end. He cannot, therefore, be allowed to use names, marks, letters, or other indicia, by which he may induce pur-

chasers to believe that the goods which he is selling are the manufacture of another person."

In The Collins Co. v. Brown, supra:

"A person may acquire a right of using a particular mark for articles which he has manufactured, so that he may be able to prevent any other person from using it, because the mark denotes that articles so marked were manufactured by a certain person; and no one else can have a right to put the same mark on his goods, and thus to represent them to have been manufactured by the person who originally used that particular mark. That would be a fraud upon the person who first used the mark in the market where his goods are sold. The simplest case is where a man puts his name and address on the goods which he manufactures; it would be unlawful for another manufacturer to put that name and address on his goods, because to do so would be to give to all the world the impression that they were manufactured by .the person whose name and address they bore.

"The simple question in·these cases is: Has the plaintiff, by the appropriation of a particular mark, fixed in the market where his goods are sold a conviction that the goods so marked were manufactured by him; and if so, and if no one else has been in the habit of using that mark, another man ·has not the right to use that mark, so as to commit the fraudulent act of palming off his goods as being the goods of the person known to have been in the habit of using it."

So it is evident that those who deny that trade-marks are property agree with the others that complainants are entitled to protection in the use of .trade-marks. And both sides meet in finding that the cause of action is the injury done or threatened to a complainant's trade in which he has used the marks in question to designate the origin or ownership of his goods and that the appropriate relief is to enjoin the defendant from using the marks to divert trade that otherwise would have gone or would go to the complainant. Whether trade-marks are accurately called property or not, it is clear that some of the rights that are incident to property do attach to them; and therefore, just as courts sometimes state jurisdictional facts by describing corporation parties as "citizens," it may be convenient to speak of trade-marks as "property," as a short way of expressing a limited truth that requires ampler means for a complete and accurate statement. And that limited truth is as compactly defined as anywhere else in Weston v. Ketcham, 51 How. Prac. (N. Y.) 455:

"There is no such thing as a trade-mark 'in gross,' to use that term of analogy. It must be 'appendant' of some particular business in which it is actually used upon or in regard to specified articles."

[1] It is not the trade-mark, but the trade, the business reputation, and good will, that is injured; and the property or right in the trade is protected from injury by preventing a fraud-doer from stealing the complainant's trade by means. of using the complainant's "commercial signature."

From these considerations of the. nature of trade-marks and the basis and scope of trade-mark suits, it would follow that complainant in this case has no property in the mark "Tea Rose," like property in its mill and wheat and flour; has no monopoly of the use of the mark, like the monopoly of a patent or a copyright; has no right at all to ·the mark "in gross," but a right only to the extent that the mark is

"appendant" to its trade; has no basis of complaint except for injury to its business; and (since defendant has traded honestly in markets where complainant is unknown and has neither committed nor threatened an injury to complainant's reputation and good will) has no cause of action in equity. But complainant nevertheless relies upon expressions to the effect that trade-marks are without "territorial limitation," are the exclusive property of their first adopters throughout the sovereignty within which they were anywhere applied by them to articles of commerce, and contends that the "unfair competition" cases in which the concurrent use of marks or names not susceptible of adoption as technical trade-marks was permitted, provided fraud and deception were sufficiently guarded against, have no application. It is proper, therefore, to inquire: What is the nature of the differences between "unfair competition" and "technical trade-mark" cases? And, in what sense, if any, is it true that trade-marks have no territorial limitations?

When suits were based solely upon the fraudulent use of technical trade-marks, very frequently the controversies were confined to the defense that the marks in question were not susceptible of exclusive appropriation. Under the influence of the fact that the upholding of that defense would defeat a "trade-mark" suit, courts have sustained as "trade-mark" cases many that to-day would probably be classed as "unfair competition." But complainants soon began to reply: If it be true that these marks have no primary signification that we are the originators or owners of the articles so marked, nevertheless consumers in the markets where our goods are sold have come to recognize them as ours by means of these marks, which have thus acquired a secondary meaning that points to us as originators or owners, and the defendant has no more equitable right to use that mark in its secondary meaning than any mark of primary meaning as a mask for robbing us of our trade. This reply called sharp attention to the foundation of the "trade-mark" suit and the reason for granting injunctive relief, and it was seen that, inasmuch as the trade, not the mark, was the property involved, and that the remedy was to stop the defendant's dishonesty in trade, it was immaterial whether the fraud-doer was filching trade by means of using others' marks in their primary meaning, or others' marks in their secondary meaning, or others' real names or nicknames, or simulated dress, or merely oral misrepresentations apart from all marks, names, or dress upon the articles. 38 Cyc. 680 and 756, and cases cited.

If a dealer adopts an arbitrary mark that is then meaningless in trade, his application of it to his article creates its only meaning. He is entitled to protection in the use of that meaning as appendant to his trade. If a dealer marks his shaving soap by the family name of "Williams," or his ale by the name of the village of "Stone," or his starch by the name of the hamlet of "Glenfield," his application of the name does not create its only meaning; but, if his trade creates a new meaning for the name, then he is entitled to just as full protection in the use of that meaning as if that were the only one. Others may use the common word in its common meaning, but they cannot use it in the particular meaning created by the complainant.

[2, 3] In both the "trade-mark" and the "unfair competition" cases the ground of the action and the reason for the remedy are identical. They are all cases of unfair competition in trade, and the remedy is to tie the hands of the unfair trader. To the extent that differences exist, they pertain, not to the underlying principle, but to the methods and degrees of proof required to enforce the principle. If a dealer has adopted a true trade-mark, his trade has given the mark its only meaning, and he need produce no other proof respecting meaning. If he has applied to his article a mark or name that had an existing meaning, it is incumbent on him to establish the fact that his trade has added a new meaning that is exclusively appendant to his trade. If a defendant has put into a common market his articles bearing another dealer's technical trade-mark, no further proof of fraud is required. If a defendant has put into a common market his articles bearing a mark or name that had a common meaning, the complainant must show that the defendant is using the mark or name, not in its common meaning, but in its new meaning created by the complainant. In "trade-mark" cases, it is sometimes said that proof of fraudulent intent need not be made. This is hardly accurate; the truth being that proof of knowing use carries proof of intent. In "unfair competition" cases, it is sometimes said that proof of actual intent must be furnished. But if by this it is declared that to uncover the defendant's malevolent purpose is enough, the statement goes too far, for an intention to filch business unaccompanied by any efficient means is not actionable. The intent that makes the defendant liable is the intent that is found in his proven acts. Now inasmuch as these differences, and any others we have ever noticed, relate to the methods and degrees of proof, and not to the nature and principle of the suit, it follows that "unfair competition" cases are applicable to the determination of the nature and principle of this suit. And in "unfair competition" cases, "of course there must be actual competition before there can be any unfair competition." 38 Cyc. 760, and notes. And since a "trade-mark" suit is an "unfair competition" suit in nature and principle, complainant in this suit has no standing because there is no competition.

"Unfair competition" cases are likewise in point on the question: In what sense, if any, is it true that trade-marks have no territorial limitations?

In Levy v. Waitt, 61 Fed. 1008, 10 C. C. A. 227, 25 L. R. A. 190, Levy was the elder adopter of the word "Blackstone" (geographical) as a brand for cigars. At the time of the suit Levy had a large trade in his Blackstone cigars in New York and the west, and Waitt had built up an extensive business in his Blackstones in New England. Waitt adopted the word "Blackstone" without knowledge of its previous use by Levy. Before Waitt established his New England trade, Levy had sold some of his Blackstone cigars in New England. But the sales were few and intermittent and resulted in no trade. To New England dealers and consumers the word Blackstone pointed to Waitt as the maker. Inasmuch as Levy had no property right in the brand except as appendant to his trade, no property right beyond insisting that the public be not deceived to the injury of his trade, he had no rights

against Waitt in New England, whatever might be his rights in the use of that brand against Waitt or others elsewhere.

In Cohen v. Nagle, 190 Mass. 4, 76 N. E. 276, 2 L. R. A. (N. S.) 966, 5 Ann. Cas. 553, the complainant Cohen adopted the word "Keystone" to identify a brand of his cigars, and built up a large trade therein throughout New England. He believed that he was the originator of the word as applied to cigars; but, before his time, the word was used as a brand in the cigar business in the middle and western states. Defendant Nagle, after Cohen had established his New England trade, began marketing in New England Keystone cigars which he purchased from a manufacturer in Pennsylvania where it was claimed that the manufacturer had a lawful right to use that word as a brand for cigars. The trial court protected Cohen by an injunction limited territorially to New England. On appeal the decree was affirmed, the majority holding that, inasmuch as Cohen had not taken a cross-appeal, no question whether he had trade rights beyond the limits of his trade was before the court. Three justices expressed the view that Cohen's trade rights did not extend beyond the limits of his trade.

Carroll, in Maryland, and McIlvaine, in New York ([C. C.] 171 Fed. 125) had each in his locality established a trade in Baltimore Club whisky. About 30 years later Carroll extended his trade to New York and sought to stop McIlvaine on the ground that Carroll was the originator of the brand. It was held in substance that, conceding priority to Carroll, and independently of whether the brand was a technical trade-mark or merely a trade-name, Carroll was not entitled to an injunction, because it was not Carroll's prior appropriation of the mark or name, but his prior appropriation of trade through the use of the mark or name, that was to be protected.

[4] These cases indicate to us that it is true in a sense that trade-marks are without territorial limitation; but not in the sense meant by complainant. The sense we perceive is one that goes back to the foundational purpose of the trade-mark suit. Since it is the trade, and not the mark, that is to be protected, a trade-mark acknowledges no territorial boundaries of municipalities or states or nations, but extends to every market where the trader's goods have become known and identified by his use of the mark. But the mark, of itself, cannot travel to markets where there is no article to wear the badge and no trader to offer the article.

Contrary to this view, certain cases are to be noticed.

In Derringer v. Plate, 29 Cal. 292, 87 Am. Dec. 170, Derringer was a manufacturer of pistols at Philadelphia, Plate at San Francisco. This statement appears in the opinion:

"The manufacturer at Philadelphia who has adopted and uses a trademark has the same right of property in it at New York or San Francisco that he has at his place of manufacture."

Yes, if Derringer was selling his pistols in the San Francisco market or any market where Plate was trying to palm off his pistols as Derringer's; and we find nothing in the report to show that such was not the fact.

In Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769, Johnson was the assignee of the property and good will, including a trade-mark, of a distillery business at Cincinnati. Kidd was causing whisky to be sold in New Orleans under the same trade-mark. Johnson obtained in the United States Circuit Court for the District of Louisiana an injunction, which was affirmed on appeal. The question was the validity and extent of the assignment of the trade-mark. Among other things, the court said:

"That transfer was plainly designed to confer whatever right Pike possessed. It, in terms, extends the use of the trade-mark to Mills, Johnson & Co., and their successors. Such use, to be of any value, must necessarily be exclusive. If others also could use it, the trade-mark would be of no service in distinguishing the whisky of the manufacture in Cincinnati; and thus the company (the assignee of the business and the mark) would lose all benefit arising from the reputation the whisky there manufactured had acquired in the market. *The right to use the trade-mark is not limited to any place, city, or state, and, therefore, must be deemed to extend everywhere.* Such is the uniform construction of licenses to use patented inventions. If the owner imposes no limitation of place or time, the right to use is deemed co-extensive with the whole country, and perpetual."

Complainant lays stress on the sentence we have italicized. But the context shows, we think, that trade-marks were not classed with patent monopolies; that the comparison was between the assignments, not the things assigned; that, inasmuch as Pike had given an unrestricted assignment, "the (assignee's) right to use the trade-mark is not limited to any place"; that, though the distillery was located at Cincinnati, the good will of the business and the trade-mark as the badge thereof could extend throughout the country; and that, since the thing to be protected was "the reputation the whiskey there manufactured (at Cincinnati) had acquired in the market," an injunction should be granted to keep the pirate Kidd out of any market in which the whisky had acquired a reputation. And nothing in the reported case indicates that the genuine Pike's Magnolia Whisky was not sold and well known in the New Orleans market.

In Griggs, Cooper & Co., Complainant, v. Erie Preserving Co. (C. C.) 131 Fed. 359, complainant was a wholesale grocer at St. Paul, dealing in canned goods under the common-law trade-mark "Home Brand," adopted in 1889, and having a trade extending through Minnesota, Wisconsin, North and South Dakota, and Montana. Defendant later came into the same territory and undermined complainant's trade by use of the same mark. In 1877 Fry & Co., a Pennsylvania corporation, had adopted the identical mark and in 1885 and 1892 registered the mark under the numbers 11850 and 20913. Complainant, learning this in 1900, took a license or limited assignment from Fry to use this registered trade-mark in said northwestern territory. The extent of Fry's trade is not stated; but seemingly complainant in establishing its trade had not come into collision with Fry. At any rate, Fry's license or assignment does not profess to convey to complainant Fry's business, reputation, and good will, or any part thereof; and throughout the territory in question the mark "Home Brand" pointed exclusively to complainant as producer. On the ground that Fry's

license or assignment of the registered mark gave complainant an exclusive proprietary interest in Home Brand within said northwestern territory, the defendant was enjoined. The decree, we believe, is sustainable on the underlying principle of the trade-mark suit and on the analogies of the Blackstone, Keystone, and Baltimore Club cases. But in looking to the decision as authority for complainant's proposition that a trade-mark has an existence independent of the trade to which it is appendant, we suggest that the registry statute does not purport to create a new right, but only to regulate a pre-existing right; that the regulation is confined to commerce with foreign nations and Indian tribes and does not touch the interstate and intrastate commerce in which the parties to the suit were competing; and that the cases of Kidd v. Johnson, 100 U. S. 617, 25 L. Ed. 769, and Fish Bros. Wagon Co. v. Fish Bros. Mfg. Co., 95 Fed. 457, 37 C. C. A. 146, as we read them, are not authorities for the proposition that Fry's license or limited assignment of the registered trade-mark, unaccompanied by any transfer of business and good will, was effectual to give complainant a monopolistic right in Home Brand in interstate and intrastate commerce in said northwestern territory.

Hygeia Distilled Water Co. v. Consolidated Ice Co. (C. C.) 144 Fed. 139, is a case wherein the complainant, beginning in 1885, built up a trade in distilled water under the trade-mark "Hygeia" in the territory of New York and "other states" unnamed. In 1890 defendant innocently adopted the same trade-mark for its distilled water and acquired a trade in "Pittsburgh and the surrounding territory." Each party remained in ignorance of the other and its doings until 1904, shortly before the start of the suit, when complainant's counsel notified defendant to quit. Down to that time, therefore, the mark "Hygeia" was a warrant to the consumers in Pittsburgh and vicinity that defendant was the producer of the water they wanted. The injunction against defendant consequently involves the proposition that complainant by adopting the mark in 1885 and then applying it to its product in New York acquired a monopoly of the mark, good for 19 years and all the years, and dominant in the Pittsburgh market and all the markets of the United States irrespective of the extent to which complainant had entered the markets. The opinion disposes of the question by saying that complainant's right to an injunction is not affected by "the fact that complainant has not up to this time extended its trade to the locality occupied by the respondent," and by citing Derringer v. Plate, 29 Cal. 296, 87 Am. Dec. 170, and Hopkins on Trade-Marks, § 13.

Derringer v. Plate has already been considered. In section 13 of Hopkins the general statement is not made that a trade-mark has no territorial limitation, but, "unlike a patent, a trade-mark has no territorial limitation." If by this it is meant that a patent is a sovereign grant and has no force beyond the territorial limits of the sovereignty, while a trade-mark, which is of a different nature, is not restricted by the bounds of states or nations or continents, but goes wherever the trade to which it is appendant goes, the statement affords complainant no comfort. And that such was the intended meaning seems to be

evidenced by the citation of The Collins Co. v. Cohen, 3 K. & J. 428, as supportive of the text. In that case complainant Collins was an American manufacturer who had a large trade and a high reputation not only in the United States but also in various foreign countries, including Cuba and Australia; but no factory, no trade, no good will, no marks registered or unregistered, in Egland. Defendant was a manufacturer at Sheffield, England, who was exporting his goods to Cuba and Australia and there undermining complainant's trade by using complainant's commercial signature. One of the defenses was that, as complainant had no trade rights in England that had been trespassed upon by the defendant in England, the case in England was not maintainable. It was also argued that there was nothing to show that the laws of Cuba and Australia did not allow traders to cheat others by palming off goods under forged commercial signatures. Vice Chancellor Wood replied:

"I apprehend that every subject of every country, not being an alien enemy —and even to an alien enemy the court has extended relief in cases of fraud— has a right to apply to this court to have a fraudulent injury to his property arrested. And the plaintiffs have the right—a right recognized, I imagine, everywhere in the world, or at least in every civilized community—of saying, 'We, being the manufacturers of certain goods, claim that another man shall not manufacture goods and put upon them our trade-mark and thus pass them off as manufactured by us.'"[1]

[5] We find nothing in conscience or in reason or in persuasive precedents that should induce us to permit complainant to dominate the southeastern markets in question, where "Tea Rose" means defendant, and thus absorb or take over the valuable trade that defendant in good faith has built up in virgin territory. If this may be done, then the trade-mark doctrine, which started out to prevent defendants from deceiving consumers to complainants' injury, has come to protect complainants in deceiving consumers to complainants' advantage at the expense of defendants.

If the junior has not established his trade in good faith, or if, having appropriated certain markets in an honest belief, he should attempt to forestall the elder trader by hastening into markets the elder was arranging to occupy, it might be that equity would have no difficulty in recognizing an inchoate right in the elder to precedence and dominance, for honesty and fair dealing should always be a strong appeal to conscience; but no such questions are here, because on the present record defendant's honesty and fairness stand unquestionable.

Another route leads to the same destination: If complainant has trade rights irrespective of the existence of its trade, whence do they come? Monopolies are in derogation of common right; they are special privileges. Every lawful monopoly is a grant from the sovereign to a selected favorite, designated by person or by class. Ohio, complainant's sovereign state, has not by constitution or statute granted it a monopoly of the use of the mark. The federal government has constitutional authority to grant monopolies for limited times to inventors

[1] Compare Richter v. Reynolds, 59 Fed. 577, 8 C. C. A. 220; City of Carlsbad v. Kutnow, 71 Fed. 167, 18 C. C. A. 24; Vacuum Oil Co. v. Eagle Oil Co. (C. C.) 122 Fed. 105.

and authors; but complainant is neither, and a trade-mark may endure forever. How far Congress might go under the commerce clause (Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550; Sarrazin v. Irby Cigar Co., 93 Fed. 624, 35 C. C. A. 496, 46 L. R. A. 541), it is needless to inquire, for the federal statute is not concerned with the commerce in which these parties were engaged. So if the monopoly here sought is the creature of law, it must be of the common law. First. Trade rights were not created by the common law. They are a part of man's natural rights. Man preceded the common law, which recognized, but did not create, the rights he was theretofore exercising. The most the common law did was to regulate their use, or, rather, to adopt and enforce the usages of honest commerce. If, because the common law recognizes and regulates a man's right to trade, it be claimed that the common law created the right, then the common law might also be called the author of his life, liberty, and happiness. And if it be said that a man has a "monopoly" in his own life or liberty or trade, then the word is wrongly used. Second. But if a monopoly in a trade-mark is created or affirmatively granted by the common law, by what common law? We need not consider the mooted question whether, generally, there is a comman law of the United States, or whether the common law administered by the federal courts in the several districts is the common law of the respective states, for, with regard to the common law of trade-marks, it is settled that the right does not arise under "the Constitution and laws of the United States." If it did so arise, the federal courts, regardless of the citizenship of the parties, would have jurisdiction to protect the right throughout the territory of the United States. Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Warner v. Searle Co., 191 U. S. 202, 24 Sup. Ct. 79, 48 L. Ed. 145. If not created by the federal law, then the supposed monopoly must have been created by the law of Ohio; and, if so, complainant's monopoly created by that law can have no extraterritorial effect.

[6] Though an order granting or denying a preliminary injunction will not be disturbed except for an abuse of discretion, a proper discretion does not include the misapplication of the law to conceded facts. Winchester Repeating Arms Co. v. Olmsted, 203 Fed. 493, 121 C. C. A. 615.

A further reason appears why complainant's showing did not justify the issuance of an injunction. Defendant proved that complainant's sales of flour in the territory in question were made under the brands "Trojan" and "Eldean Patent." If this was the same flour as its "Tea Rose," made from the same wheat and taken from the same flour bins, to permit complainant to add "Tea Rose" flour would simply tend to confuse trade in those markets, or only come to indicate a difference of grade that did not exist. Columbia Mill Co. v. Alcorn, 150 U. S. 460, 467, 14 Sup. Ct. 151, 37 L. Ed. 1144. Complainant, necessarily knowing the whole truth respecting this matter, did not meet the situation exhibited by defendant.

The decree is reversed, and the cause remanded for further proceedings not inconsistent with this opinion.