## CHARLES BROADWAY ROUSS, Inc., v. WINCHESTER CO.

(District Court, D. Connecticut.   June 13, 1923.)

No. 1609.

1. **Trade-marks and trade-names and unfair competition ⬙⟹28—Name extensively used as trade-mark for 20 years held to constitute valid common-law trade-mark.**

Complainant *held* to have acquired a valid common-law trade-mark in a name by its continuous and extensive use for more than 20 years on its goods.

2. **Trade-marks and trade-names and unfair competition ⬙⟹43—The word "Winchester" is a "name."**

The word "Winchester" is a "name," within the meaning of Trade-Mark Act Feb. 20, 1905, § 5 (Comp. St. § 9490).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Name.]

3. **Trade-marks and trade-names and unfair competition ⬙⟹43—Name printed in "particular or distinctive manner."**

A name, which invariably appears printed in a specific manner, with a particular type or flourish, is printed in a "particular or distinctive manner," within the meaning of Trade-Mark Act Feb. 20, 1905, § 5 (Comp. St. § 9490), and may be registered as a trade-mark.

4. **Trade-marks and trade-names and unfair competition ⬙⟹30—One of two affiliated corporations held not entitled to use trade-mark of the other.**

The fact that a new corporation is affiliated with an older one is under the same control and has largely the same officers, where the older one is still doing business and has not assigned its good will or trade-mark rights, does not give the newer corporation the right to use the trade-mark of the older on goods which the latter has never made or dealt in.

5. **Trade-marks and trade-names and unfair competition ⬙⟹73(2)—Corporation cannot adopt and use a corporate name as a trade-mark as against a competitor who had acquired the right to such name as a trade-mark.**

The rule that one may use his own name on his own goods does not give the right to a corporation to adopt as its corporate name, and use as a trade-mark, a name which is the valid trade-mark of a competitor.

6. **Trade-marks and trade-names and unfair competition ⬙⟹59(4)—Trade-mark, "The Winchester," held infringed.**

Complainant, by more than 20 years' extensive use, acquired a common-law right in the name "The Winchester" as a trade-mark for articles of dry goods, and also registered such name as a trade-mark for shirts. The Winchester Repeating Arms Company had for many years previously used and still uses the name "Winchester" as a trade-mark for firearms and ammunition, but has never dealt in dry goods. Defendant Winchester Company was organized by persons interested in the Arms Company and commenced dealing in dry goods, including shirts, using the name "Winchester" as its trade-mark. *Held,* that such use was an infringement of both complainant's common-law and registered trade-mark.

In Equity.   Suit by Charles Broadway Rouss, Inc., against the Winchester Company.   Decree for complainant.

Munn, Anderson & Munn, Orson D. Munn, and T. Hart Anderson, all of New York City, for plaintiff.

Henry E. Rockwell, of New Haven, Conn., for defendant.

⬙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

THOMAS, District Judge. In its bill of complaint plaintiff alleges that it is a corporation organized under the laws of the state of New York and engaged in interstate commerce; that it is the owner of a trade-mark consisting of the words "The Winchester," which is registered in the United States Patent Office; that it is engaged in the wholesale dry goods business, and has been so engaged since its incorporation, prior to 1918. It is also alleged that the plaintiff's predecessor in business, Peter W. Rouss, was' engaged in the same line of business since 1900, and that said Rouss, on March 1, 1900, adopted and began to use the trade-mark "Winchester" in connection with the sale of men's furnishings, and more particularly shirts. Since that time the business has ·expanded, so as to include numerous other articles, to which the trade-name "Winchester" has been attached. · In 1918 Rouss duly transferred to the plaintiff his business, together with the good will and trade-marks thereto attached. The bill then charges both an infringement of the trademark rights of the plaintiff and unfair competition, through the use by the defendant of the word "Winchester" in connection with the sale of merchandise similar to that sold by the plaintiff and in the localities in which the plaintiff is doing business. ·

The answer contests the validity of the registration of the plaintiff's trade-mark and affirmatively asserts a right to the use of the word "Winchester" in connection with the sale of the merchandise specified. I conclude that the evidence establishes the following material facts:

The plaintiff is extensively engaged in the sale, both wholesale and retail, of various articles of merchandise which come under the general classification "dry goods." It is the successor of Peter Winchester Rouss, better known in the trade as Charles Broadway Rouss, who was in the same general line of business in 1900 and prior to that time. Some time prior to 1900 Rouss did adopt and apply the trade-name "Winchester" to articles of merchandise such as shirts, hats, garters, small wear, sheetings, piece goods, and underwear. The business has been extensive and is extensive, and its operation extends over a very large part of the United States. It has sold a number of articles under the trade-mark or trade-name "Winchester"— e. g., shirts since 1901; men's underwear for several years; flannel shirts, 4 years; pajamas, 10 years; neckties, 20 years; jumpers and overalls, 25 years; sheetings, 25 years; garters, 10 years; ribbons, 20 years; and men's made to order clothing for several years. I also find that during the period of approximately 25 years the sale of shirts by the plaintiff under the trade-mark "Winchester" has amounted to about $5,000,000, and that the plaintiff to-day has about 23,000 customers, who are retail storekeepers, and to whom merchandise is sold bearing the trade-mark "Winchester."

I also find that the Henry Repeating Arms Company was organized by an act of the Legislature of the state of Connecticut in 1865, and that the purposes of its organization were to manufacture every variety of firearms and other implements of war. I also find that the defendant, the Winchester Company, was incorporated under

the corporation statutes of the state of Connecticut, and that by its certificate of incorporation its purposes were to manufacture, buy, sell, etc., rifles, guns, cannon, and other firearms, etc., ammunition, etc. Several other purposes are stated, none of which is germane to any issue in this case, except the one under which it was empowered—

"to hold, own, use, mortgage, sell, convey, or otherwise dispose of real and personal property of every class and description in any of the states, districts, colonies, dependencies, and possessions of the United States."

I also find that the Henry Repeating Arms Company changed its name to The Winchester Repeating Arms Company at a time prior to the time when the plaintiff's predecessor adopted his trade-mark, and that the Winchester Repeating Arms Company used the word "Winchester" as a trade-mark upon the goods manufactured and sold by it, and such goods consisted solely of arms and ammunition, articles used in connection with arms and ammunition, and kindred articles. The evidence as to the connection between The Winchester Company and the Winchester Repeating Arms Company is to the effect that the officers of the two corporations are largely the same, and that the defendant was organized in 1919 and "took over the control" of the Winchester Repeating Arms Company, and that the two companies are closely affiliated, and that their policies are developed in common. With these somewhat indefinite conclusions, there is no testimony as to the specific transfer of any property interests from the Winchester Repeating Arms Company to the defendant, but later on attention will be directed to this aspect of the case.

It seems to be fairly well conceded by the defendant that, in the literal and nontechnical sense, a trade-mark was adopted and used by the plaintiff, and that, had the plaintiff, instead of using the word "Winchester," used some other word, especially of some arbitrary creation, then the evidence would warrant the conclusion that, wholly irrespective of the registration, the plaintiff would have acquired a common-law trade-mark. The extent of the plaintiff's business, the duration of the same, the intensive use of the word "Winchester" in connection with the sale of its merchandise, all point in the direction of the acquisition by the plaintiff of a common-law trade-mark in this word, and had this word been some other word, and not a word which was part of the defendant's name, or the name of some other corporation or individual, the defendant would not have contested the validity of the plaintiff's claim.

The defendant's position, however, is that, as to the registration, the plaintiff never did have the right to secure registration, and that therefore its registration was ineffective; second, that the defendant is using its own name only upon the articles of merchandise sold by it; third, that as the associate and affiliate of the Winchester Repeating Arms Company it has the same right to use the word "Winchester" as the Winchester Repeating Arms Company has, and that the latter company has the right to use the word "Winchester," not only upon arms and ammunition and kindred articles, but upon articles in connection with any other business upon which it desires to embark.

290 F.—30

[1] It becomes necessary, therefore, in the first instance, to examine the question as to whether or not the plaintiff did acquire a common-law trade-mark in the word "Winchester," and the related question as to whether or not it did succeed in effectively registering the mark in the Patent Office. It is contended that the word "Winchester" is a family name, and it is also conceded that the word is the name of a town in Virginia. The word itself suggests its name connotation, and I think it may be fairly well assumed that, whether the word is the name of a place or a person, that it is a name.

Starting, then, from this premise, we are confronted with the proposition that no valid trade-name can be acquired through the use of a name, unless the extensive and intensive use of that name results in the development of what has been called the "secondary meaning." The law on this subject has been aptly stated in Merriam Co. v. Saalfield, 198 Fed. 369, 117 C. C. A. 245. On page 373 of 198 Fed. (117 C. C. A. 249) Judge Denison, writing for the Circuit Court of Appeals for the Sixth Circuit, said:

"Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public, and so may be used by any one of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning."

The evidence in this case does disclose the development of this "secondary" significance, and I have therefore no hesitation in reaching the conclusion that Charles Broadway Rouss did acquire a common-law trade-mark upon dry goods, and that that trade-mark was "The Winchester," and that the plaintiff, by assignment to it from Charles Broadway Rouss, is now the owner of that trade-mark.

[2] A more difficult question arises with relation to the validity of the registration of this trade-mark on February 8, 1921. Registration is a purely statutory procedure, neither validating nor invalidating any common-law rights which one may have in a trade-mark. The possession of a common-law trade-mark does not, of necessity, involve the right to effect registration under congressional act; nor does the act of registration demonstrate the exclusive possession of

a trade-mark or a right thereto. Under subdivision (b) of section 5 of the act of 1905 (Comp. St. § 9490), which subdivision is still in force, it is provided that "no mark which consists merely in the name of an individual, firm, corporation, or association, not written, printed, impressed, or woven in some particular or distinctive manner, or in association with a portrait of the individual," shall be registered. It is doubtful whether this exception is intended to be literally enforced. It is possible that a name might be selected for registration which was an arbitrary invention of the manufacturer, but which, nevertheless, might happen to constitute the name, or part of the name, of some corporation in some distant state, of which fact, however, the manufacturer might have neither notice nor even suspicion. However, we are not confronted with a situation of that kind in the instant case. I think it may be fairly well held, as a matter of law, that the word "Winchester" is in common parlance to be regarded a name.

[3] This brings us, then, to a consideration as to whether the registration of this name was affected under the conditions provided for in the act. Is this name printed "in some particular or distinctive manner"? The name as it appears on the label is as follows:

Now, is there no definition of what constitutes a "particular manner" or a "distinctive manner"? I am, however, inclined to hold that, where a name invariably appears printed in a specific manner with a particular type or flourish, it is, for the purposes of the statute, a "particular" or "distinctive" manner. It will be noted in the instant case that the word "The" is in Roman print and contained within the loop of the W commencing the word "Winchester," while the word "Winchester" is in script. This specific manner of writing out the words "The Winchester," uniformly adhered to, I regard as a "particular" manner, and I therefore conclude that the registration of this trade-mark was effective.

It becomes obvious, then, that as against any persons or corporations whose names are not "Winchester," and who have not used the word "Winchester" in the exploitation of their products, the plaintiff has not only a common-law trade-mark, but an effective national registration thereof. This registration is, of course, confined only to shirts, so that, with reference to all other articles involved in this case, the status of the plaintiff is that of the owner of a common-law trade-mark.

It is, however, the contention of the defendant that it has a lawful right to exploit its own products under its own name, and that its affiliation with the Winchester Repeating Arms Company gives it an additional right to the use of the name "Winchester," which right antedates that of the plaintiff.

[4] There is no evidence before me which indicates that The Winchester Repeating Arms Company ever did deal in the articles set forth in the complaint. On the contrary, the evidence is that this old corporation has confined itself to the manufacture of arms and ammunition, and that it is still functioning. An examination of the act under which it was created discloses that the purposes of its incorporation were confined to the manufacture of arms and ammunition, and subsequently that these purposes were later extended to take in operations such as mining. At no time was or is the Winchester Repeating Arms Company empowered, under its charter, to traffic in any of the commodities detailed in the bill of complaint. At no time did it traffic in such commodities. It never did acquire any trade-mark, either common-law or otherwise, with reference to such articles as shirts, and in view of the limitations contained in its charter it could not lawfully have acquired such a trade-mark in such trade.

Nor is there any evidence before me that the defendant acquired any trade-marks, good will, or trade-names from the Winchester Repeating Arms Company. There is no evidence of, or even any allegation of, any assignment or transfer of such trade-marks or trade-names to the new corporation, and it is an elementary proposition that, even if there had been any attempted assignment of trade-marks or trade-names, such assignment would have been ineffective, unless it was accompanied by the transfer of the business and good will thereof. It follows, therefore, that whatever rights the defendant has are such as it would have had, wholly irrespective of the prior existence of the Winchester Repeating Arms Company. It acquired nothing from the latter company, not even its name, and any corporation desirous of entering into the dry goods field could have incorporated under the name "Winchester" with a right equal to that of the defendant, and the fact that the officers of the two companies are almost identical, or that the policies of the two companies are developed in common, has no bearing on any issue in this case.

The situation then is that, at the time when the plaintiff had acquired a common-law trade-mark in the use of the word "Winchester" as applied to various articles of dry goods, the defendant was incorporated under the name "The Winchester Company." In the specific enumeration of its powers, it nowhere appears that the purposes of the corporation were to traffic in dry goods. On the contrary, the general impression is gained that these powers are practically identical with those of the Winchester Repeating Arms Company. However, we may assume that, under the omnibus clause hereinbefore quoted, it is not acting ultra vires when it is dealing in dry goods.

I find that the defendant's business involves the sale of numerous articles similar in kind to those of the plaintiff, and that the business of the defendant is conducted within the same territory as that of the plaintiff. It is claimed by the defendant that its merchandise is distinctly superior to that sold by the plaintiff; but, assuming this to be true, without so deciding, I cannot find anything in this which would serve to negative the contention that the two parties operate their business within the same field. Such operation within the same field naturally results in competition between the two, and such competition in the very nature of the case must of necessity involve confusion of identity. Nor can I find anything in the peculiar form of "staggered" lettering adopted by the defendant, which would serve adequately to discriminate between the products of the two parties.

There is no evidence before me of any fraudulent intent by the defendant in the use of the word "Winchester" upon the articles complained of in the bill. There is, however, a concession that the defendant was notified of the claim of exclusive right by the plaintiff prior to the commencement of the suit, and of the repudiation of that claim by the defendant. Under these circumstances, the question as to intent in the adoption and continued use of the word "Winchester" by the defendant upon the articles complained of can only have relevancy upon the related question of damages, for in my view the use of the word "Winchester" by the defendant within the field of business activities of the plaintiff constitutes unfair competition, in addition to constituting an infringement, as to shirts, of the plaintiff's rights as secured under its registration.

[5] Nor can I find that the ordinary rule with reference to the use of one's name in one's own business has application in the case at bar. That rule is to the effect that one may use one's own name in one's own business, even though that name happens to be the trade-mark or trade-name of another, provided that in the use of one's own name such procedure is adopted as would cause the public to discriminate between the products of the two manufacturers. I consider that that rule would be applicable to the case of a person whose name was actually "Winchester" or to the case of a corporation which, having acquired a trade-name of its own with reference to certain articles, thereafter enlarged the field of its activities to include articles similar to those dealt in by the plaintiff. In other words, had the Winchester Repeating Arms Company been empowered by its charter to deal in shirts, shoes, underwear, etc., and had it begun to deal in such articles at a time after the plaintiff had acquired his common-law trade-mark, then the only question before the court would be to limit the use of the name "Winchester" by the old corporation in such a way as to apprise the public of the fact that the articles sold by the old corporation did not originate from the same source as those sold by the plaintiff.

In this case, however, we have a new corporation, the name of which is selected by its organizers, and which, immediately upon its organization, proceeds to invade the field of the plaintiff and to apply to its products a trade-mark similar to that of the plaintiff. I

hold that, where a corporation is thus initiated, the ordinary rule of the use of one's own name has no application, and that under such circumstances the deliberate choice of such name for such a corporation constitutes an essential element of the act of unfair competition, and therefore is just as much the subject of restraint, when used in connection with the sale of competing merchandise, as is the use of the label itself.

[6] I therefore conclude that the plaintiff is entitled to an injunction restraining the defendant from the use of the word "Winchester" as a mark upon shirts, underwear, piece goods, pajamas, hats, neckties, shoes, jumpers, and men's made to order clothing, and to an accounting of profits and damages.

Let an interlocutory decree be submitted in accordance with this opinion, providing for the issuance of such an injunction and for the appointment of a special master to determine the amount of profits and damages, if the plaintiff desires such accounting.

Ordered accordingly.