## HUDSON MOTOR CAR CO. v. HUDSON TIRE CO.

District Court, D. New Jersey.   September 12, 1927.

**Trade-marks and trade-names and unfair competition ⊜=61, 68(3)—Tire company's use of name, phrase, and triangular trade-mark of automobile manufacturer held infringement and unfair competition.**

Tire company *held* enjoined from using name, phrase, and triangular trade-mark used by automobile manufacturer, notwithstanding that defendant's original employment of name antedated incorporation of plaintiff, since use of such name, phrase, and distinctive trademark constitutes infringement of trade-mark and unfair competition.

In Equity.   Suit by the Hudson Motor Car Company against the Hudson Tire Company.   Decree for plaintiff.

Samuel D. Oliphant, of Trenton, N. J. (Macleod, Calver, Copeland & Dike, of Boston, Mass., and George P. Dike and Elmer J. Gray, both of Boston, Mass., of counsel), for plaintiff.

Philip J. Schotland, of Newark, N. J., for defendant.

RUNYON, District Judge.   The plaintiff herein, manufacturer of Hudson automobiles, has brought suit in equity against the Hudson Tire Company, of Newark, N. J., charging trade-mark infringement and unfair competition on the part of the defendant in its manufacture and sale of automobile tires, variously marked "Hudson Cord," "New Hudson Cord," and "Hudson Super Cord."

The Hudson Motor Car Company was organized under the laws of Michigan in the month of February, 1909, and has continued to do business under such original corporate name at all times since that date.

In July, 1909, it adopted as a trade-mark for its cars and various parts thereof the word "Hudson," displayed within an inverted triangle, and registered the same under the Trade-Mark Act of 1905 (15 USCA § 81 et seq.), filing its application therefor on October 6, 1911, and receiving such registration on August 8, 1916.

On October 2, 1915, this company also adopted the word "Super-Six" as a trade-mark to designate its automobiles, filed its application for registration thereof on November 26, 1915, and secured same on May 2, 1916.

The word "Hudson," within the triangle, is placed on the radiator name plate of the company's cars, and stands out conspicuously, being enameled a dark color as against the white-enameled background of the solid metal triangle.   The name also appears on various other parts of the cars and on accessories, such as bag containers and shipping crates.

The trade-mark "Super-Six" is used in connection with the word "Hudson," and appears on the hub caps of the company's cars, within the triangle, and forming the phrase "Hudson Super-Six."

Mr. Ehrlich, president of the defendant company, testifies that he began the use of the word "Hudson" in connection with his business about 1906 or 1907.   He had had a stable, located near the Hudson boulevard in Jersey City.   Converting it into a garage and renting a portion thereof to the local agent of the Cadillac car, he named his place the Hudson Garage, and, after conducting same as a general garage for about five years, sold it later to another party who continued the business under the name of the Hudson Taxicab Company & Hudson Garage.

After five years in the garage business, he testifies that he drifted into the making of tires, first at Jersey City in the garage, and after 1914 in the city of Newark.

The nature of his early product is described by him as follows:

"Why, I took a—like a used tire, like it would go bad in the bead, some of the tires that they run flat, or the bead wasn't perfected right in those days; they put in some fabrics or something instead of putting in steel wires and the bead wouldn't stand up; and I would buy up these tires at the factories or various different places where they had them, and then the tires that were wore out, I would put that tire on top of the other one and then sew it together."

On this product were burnt in with an electric stencil the words "Hudson Double," or the single word "Hudson."

While these double-tread tires are still continued as a part of defendant's business, the manufactured tire, first made by another company for defendant about 1920 and bearing its present corporate name stamped thereon, is the larger activity at present.

The first corporate name of defendant was "Hudson Double Tire Company, Inc.," secured by charter dated December 13, 1915; this name being changed to its present one,

"Hudson Tire Company, Inc.," by amended charter filed the next year.

With the manufactured tires was instituted a new set of names, the various designations being "Hudson Super Cord," "the New Hudson Cord," and "Hudson Cord"; and it is to secure a discontinuance of the use of the triangle and the words "Hudson" and "Super" in connection with the output of defendant's tires that this action is brought.

By way of recapitulation, it may be said that the president of the defendant company first used the word "Hudson" about 1906 or 1907, when he named his garage, located near the Hudson boulevard in Jersey City, Hudson county, the "Hudson Garage."

In February, 1909, the Hudson Motor Car Company was incorporated, and in July of the same year it adopted the use of the word "Hudson" and the inverted triangle as its trade-mark, filing its application for registration thereof on October 6, 1911.

In 1911 or 1912, after five years in the garage business, the president of the present defendant company, before any incorporation was had, drifted into the making of tires, branding them the "Hudson" or "Hudson Double."

On October 2, 1915, the plaintiff company adopted the trade-mark "Super Six" to describe its cars, filing its application for registration thereof on November 26, 1915.

On December 13, 1915, the defendant company, under the name of "Hudson Double Tire Company, Inc.," was incorporated.

In 1916 defendant's charter was amended and the corporate name changed to "Hudson Tire Company, Inc."

On May 2, 1916, plaintiff company secured the registration of its "Super Six" trade-mark, and on August 8, 1916, registration of its trade-mark "Hudson," within the inverted triangle.

In 1919 or 1920, defendant company began to put out its own tires, as manufactured for it, and then adopted the word "Super" as a part of the tire name, and also used the inverted triangle.

It is thus to be seen that the first use of the word "Hudson" was in its application to the Jersey City garage, and the appropriateness of the term is clearly evident when its location is remembered. The plaintiff company had not come into existence, and neither was there any special feature or output of the garage business to which the name "Hudson" might have been attached in the sense of distinguishing it from other products of the same class. It was the ordinary garage business, and the word "Hudson" in connection therewith accomplished nothing more than to distinguish the place itself from other garages. Therefore no exception can be taken to Mr. Ehrlich's original appropriation of the word "Hudson."

In the year 1909, there came into existence the plaintiff company, given the right by the state of Michigan to adopt the title "Hudson Motor Car Company" and to manufacture automobiles under that name. Quite contrary to the designating function performed by the word "Hudson," as applied to the Jersey City building, the primary use of the word "Hudson" in the Michigan incorporation has been to identify the product of the corporate business and to distinguish it from any other automobile made.

And, as marketability depends largely upon excellence of product, especially in the case of commodities classified more or less as luxuries, it behooves a manufacturer to guard well his product, to the end, not only that everything entering into such product shall merit his own approval as well as that of the public, but also that the name of his product in its every part shall be held to a like standard of excellence. In no other way can a buying public, guided largely by titles and names in its purchases, be protected.

All this, it would appear, the plaintiff company has endeavored to do. And in furthering general public knowledge of its cars it has expended millions of dollars; the result being that the "Hudson" is one of the country's best-known automobiles, while the name "Hudson," whatever may have been the reason which prompted its adoption—a surname or a geographical designation—has, through its widespread and long-continued use, gained a secondary meaning quite apart from its original one, which was that of a name and nothing more.

In discussing the rule regarding such secondary meaning, the court, in Merriam v. Saalfield (C. C. A.) 198 F. 369-373, says:

"Hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his prod-

uct; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning,' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning."

See, also, Wells & Richardson Co. v. Siegel, Cooper & Co. (C. C.) 106 F. 77; Colgate v. Adams (C. C.) 88 F. 900; also French Republic v. Saratoga-Vichy Co., 191 U. S. 427, 435, 24 S. Ct. 145, 48 L. Ed. 247; Elgin Nat. Watch Co. v. Loveland (C. C.) 132 F. 41, 46, 47; Fuller v. Huff (C. C. A.) 104 F. 141, 51 L. R. A. 332; British-American Tobacco Co. v. British-American Cigar Stores Co. (C. C. A.) 211 F. 933; O. & W. Thum Co. v. Dickinson et al. (C. C. A.) 245 F. 609; Scandanavia Belting Co. v. Asbestos & Rubber Works of America (C. C. A.) 257 F. 937; Trappey v. McIlhenny Co. (C. C. A.) 281 F. 23; Charles Broadway Rouss v. Winchester Co. (D. C.) 290 F. 463; Globe-Wernicke Co. v. Brown et al. (C. C.) 121 F. 185; Zittlosen v. Boss (C. C. A.) 219 F. 887.

It was long after the plaintiff company had launched its business and begun to build its reputation that the defendant's president "drifted into making tires." Giving up the garage business, he testifies that he began the collection of faulty tires of various makes, some with beads that "wouldn't stand up," others that were worn out, still others that had run flat; and, placing one faulty tire on top of another afflicted one—their respective ailments being different, however—would sew them together and produce for sale a "Hudson Double."

Despite this use of the word "Hudson" as first employed in connection with tires at that time, I am of the opinion that the appearance of the product itself would have sufficed to protect the plaintiff company against loss through any misunderstanding on the part of the purchasing public. Palpably a made-over tire, buffed and cleaned somewhat, but oftentimes with the name of the original makers remaining intact upon the outer shoe, the mixed ancestry of a "Hudson Double" was clearly evident.

It therefore becomes necessary to follow the defendant company's activities through to a more recent day in order to determine the justice or error in the plaintiff's claim.

The defendant company had been manufacturing or assembling "Hudson Double" tires for four or five years when the Hudson Double Tire Company, Inc., was first incorporated in December, 1915, and at this time the word "Hudson" had ceased to have any special geographical significance, inasmuch as the business had been removed from Hudson county to Newark in 1914.

A year later the corporate name was changed to Hudson Tire Company, Inc., although the nature of the business seems to have remained the same, for it was not until the year 1919 or 1920 that the defendant company began to have manufactured for it, and to sell, its own tires.

And it is at this point that the defendant company appears to me to have appropriated deliberately, for its own gain, much of that to which the plaintiff company had become entitled, and for the development of which, as valuable trade factors, it had expended and still spends large sums of money. For, in addition to its corporate name, carrying in all its published forms the display word "Hudson" and the word "Detroit" in bold lettering, the plaintiff company had gained the right through registration to use the words "Super Six" as descriptive of its cars and also to employ an inverted triangle as a frame to surround its authorized phrases. When the defendant company's new style of tire made its appearance, it had adopted as portions of its descriptive legend, stamped in the fabric, both the word "Super" and the inverted triangle. Following the stamp around the circle one reads and sees on a typical tire the following: "Hudson Super Cord (inverted triangle surrounded by words 'Hudson Super Cord') Mfd. by Hudson Tire Co. Newark N. J. U. S. A. 257147 30x3½— 105/585 Patent applied for."

A portion of this lettering is conspicuously large, another portion of much smaller and less noticeable proportions, and this latter class is composed of the words "Mfd. by Hudson Tire Co. Newark N. J." and "Patent applied for," and the serial (?) number 257147.

The defendant company champions its use of the word "Super" on the ground that it is simply descriptive of an oversized tire, and that therefore its employment of the words "Hudson Super Cord" is in nowise an infringement of the plaintiff company's rights.

This defense of the single word "Super" may have its justification, but, when taken in connection with the word "Hudson," it becomes Hudson Super, and Hudson Super is one of the terms by which the plaintiff's car has become commonly known. And furthermore, when the inverted triangle, another of plaintiff's authorized creations, likewise appears in the defendant's combination, it be-

tokens to me a comprehensive plan to secure an altogether unwarranted advantage.

Now, while the field of synonyms which may describe an oversized tire is doubtless a most limited one, the field of allowable designs which may become associated in the public mind with a certain product knows no limits, and the drafting of the inverted triangle to serve with "Hudson" and "Super" is therefore eloquent of the defendant company's studied attempt to profit by the plaintiff's dearly bought efforts to further its own legitimate business.

A survey of the advertisements of two hundred and twenty-six tire companies appearing in a tire rate book, one page of which appears as an exhibit in this case, also discloses the fact that none of them places upon the single word "Super" the entire burden of conveying the thought that an oversized tire is indicated as the defendant claims justification for having done.

There are but ten of the more than two hundred other manufacturers who make any use of the word "Super," and their use is thus indicated in the respective cases: "Super-Grip-Cord Tires," "Super Size Tires," "Super Size Fabric," "Super Tread Cord Tires," "Extra Super Size," "Super-Oversize," "Supershod," and "Super Size Cord."

These facts of themselves are to my mind strongly persuasive of the thought that the defendant company's use of the word "Super" had more than the one asserted reason for its employment.

In addition to the foregoing, there was evidence offered at the trial by the plaintiff which tended to show that the defendant company made proposals to at least one Hudson car dealer to remove the original tires from a new Hudson car and substitute the Hudson Super Cords therefor, with a cash or credit allowance to the dealer for the difference in price, and that on several occasions these changes were actually made.

This scheme, carried into execution, would mean in each instance the removal of the standard Goodyear, Fisk, or Miller tires used by the Hudson Company on its car and the installation of Hudson Super Cords on a Hudson Super Six.

Although the defendant denied this line of testimony, the fact that the witnesses who gave it are disinterested parties adds serious weight to their words, and I am impressed by it as evidencing another attempt to associate its own product with that of the plaintiff for whatever such occasional installations might be worth.

The defendant further contends that, if it could at any time have been deemed guilty of infringement, it purged itself when, upon notification by plaintiff of its claims, it abandoned the triangle and substituted a triangular pennant "on the Yale Banner style," and inserted the words "The New" before the words "Hudson Cord."

Vizualization of these changes fails to carry conviction of sincerity. The "banner style" is nothing more nor less than a triangle of somewhat different shape, while the words "The New" are altogether inconspicuous when compared with the lettering and size of the words "Hudson Cord."

This persistency, I believe, is further proof of defendant's studied efforts to secure advantage at the expense of the plaintiff, for, while the evidence shows that the Hudson Motor Company does not manufacture its own tires but uses standard makes for the purpose of equipping its cars, tires are so closely allied to automobiles in the public mind, and indeed so essential a part of the completed car, that a phrasing or trademark used to exploit a tire which is identical with or largely similar to the phrasing or trade-mark by which a certain make of automobiles is known, is distinctly calculated to convey the idea of common origin to the public mind.

That this is the case may be gathered from the language of our own Circuit Court of Appeals in the case of Akron-Overland Tire Co. v. Willys-Overland Co., 273 F. 674, at page 676, where the court says, in part:

" * * * While it may be conceded that the plaintiff company manufactures automobiles and the defendant does not, and while the plaintiff does not make or sell automobile tires, and the defendant retreads and sells tires, and in exact terms the two do not compete in these particular things, yet the fact remains that the business of both is so connected with automobiles that the public, in buying the stocks, securities, and retread tires of the defendant company, by the use of the word 'Overland' in connection therewith, will, by such descriptive word, be led to believe it is buying property or articles owned or dealt in by the plaintiff or one of its subsidiary companies. That the plaintiffs had in the word 'Overland' a good will of high reputation and great value in connection with automobiles cannot be gainsaid. That the defendants' use of the word 'Overland,' in connection with the sale of its retread tires and its stocks and securities, would enable it to share in the plaintiff's good will and reputation, also cannot be gainsaid. That such use of the word 'Overland'

by the defendant would breed confusion and misunderstanding in the minds of the public is foreshadowed by what did happen in the way of third parties confusing and connecting the defendant and its acts with the plaintiff company, and even holding the plaintiff accountable for such acts. Indeed, it is manifest that under the facts of this case the maintenance by the plaintiff of the good will attributed to Overland business and products would, in the future, be determined, not alone by what the plaintiff did to uphold the standard of that good will, but by what the defendant might do by failure to uphold such reputation and maintain such good will. * * * It will thus be seen that the business of both companies, because they both concerned some phase of automobile activity, were interrelated, and that since the operations of the plaintiff company in that field were known to, and described by, the public by the business or trade-name of 'Overland,' it necessarily followed that, when the defendant company sought to also describe its ventures by the trade-name 'Overland,' it was calculated to confuse the public mind and enabled the defendant to draw to itself, and to draw from the plaintiff, the exclusive trade-name and trade good will which the plaintiff, by a business course of years, had given to the word 'Overland' in connection with the automobile industry. Such being the fact, it follows that both the English and American authorities justify the court below in its action, for in fact there was substantial and material competition between these parties."

The same court has gone even further in its protection of a trade-name, extending it to a case where there was no similarity or kinship in the respective products except for the employment of electricity in each.

In the case of Wall v. Rolls-Royce of America, Inc. (C. C. A.) 4 F.(2d) 333, 334, the court said:

"It is true those companies made automobiles and aeroplanes, and Wall sold radio tubes, and no one could think, when he bought a radio tube, he was buying an automobile or an aeroplane. But that is not the test and gist of this case. Electricity is one of the vital elements in automobile and aeroplane construction, and, having built up a trade-name and fame in two articles of which electrical appliances were all important factors, what would more naturally come to the mind of a man with a radio tube in his receiving set, on which was the name 'Rolls-Royce,' with nothing else to indicate its origin, than for him to suppose that the Rolls-Royce Com-

pany had extended its high grade of electric product to the new, electric-using radio art as well. And, if this Rolls-Royce radio tube proved unsatisfactory, it would sow in his mind at once an undermining and distrust of the excellence of product which the words 'Rolls-Royce' had hitherto stood for."

And, while defendant's original employment of the word "Hudson" undoubtedly antedated the incorporation of the plaintiff company, and had the warrant of local appropriateness at the time, its subsequent employment of that name in combination with another word "Super," which plaintiff concededly employed first, and with the previously registered triangle trade-mark of plaintiff, has, in my opinion, rendered each and every part of defendant's use of "Hudson," "Super," and a triangular trade-mark violative of plaintiff's just rights.

A decree may be presented enjoining the use of the word "Hudson" as a portion of defendant's corporate name and as a trade-mark for tires; against the employment of the phrase "Hudson Super" as descriptive of its tires, and providing for and ordering the cancellation of its registration No. 183,-262.